**WILLIAMS HOME, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**MILLER HOME, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. Nos. 78–0132–L, 78–0133–L.

United States District Court, W. D. Virginia, Lynchburg Division.

May 4, 1982.

Robert C. Wood, III, Lynchburg, Va., for plaintiffs.

Mitchell R. Berger, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

The plaintiffs, Williams Home and Miller Home, in this consolidated action, come before this court seeking a refund of Federal Excise Taxes paid under 26 U.S.C. § 4940. The Williams Home, who for all relevant times has been engaged in maintaining a retirement home for women aged 55 and older, seeks a refund for fiscal years ending August 31, 1971 through August 31, 1978. The Miller Home, who for all relevant times has engaged in the operation of a shelter for young girls, seeks a refund of excise taxes paid for the years 1971 through 1978. At all relevant times, both plaintiffs have been charitable organizations recognized by the Internal Revenue Service as tax exempt, pursuant to § 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. The tax benefits accruing to § 501(c)(3) organizations are not in jeopardy in these actions. The sole issue before this court is whether the plaintiffs properly were required to pay the excise tax on their investment income which is assessed upon all § 501(c)(3) organizations, with four exceptions. I.R.C. §§ 509(a), 4940(a). A consolidated trial was held in Lynchburg, Virginia, on May 7 and 8, 1981.

The Williams Home claims that a refund in the amount of $58,811.00 is due based on the following grounds; (1) That I.R.C. § 4940, as applied to the Williams Home, violates the equal protection guarantee inherent in the due process clause of the Fifth Amendment, because it is arbitrary and capricious and it makes an unreasonable classification of taxpayers; (2) That the Williams Home is a "publicly supported" organization described in I.R.C. § 170(b)(1)(A)(vi), because it meets the criteria of Treasury Regulation § 1.170 A–9(e)(3); (3) That notwithstanding the Treasury Regulations promulgated pursuant to I.R.C. § 170(b)(1)(A) and I.R.C. § 509(a), the Williams Home is a "publicly supported" organization within the meaning of I.R.C. § 170(b)(1)(A)(vi), and to the extent that a contrary conclusion could be made under the Treasury Regulations, such regulations are invalid; and (4) That the Williams Home is a "church" within the meaning of I.R.C. § 170(b)(1)(A)(i).

The Miller Home claims that a refund of $20,398.22 is due for the same reasons set forth on behalf of the Williams Home, except that the Miller Home concedes that it does not meet the "public support" test of Treasury Regulation 1.170 A–9(e)(3).

Initially, plaintiffs contend that under I.R.C. § 4940 they are unconstitutionally required to pay an excise tax, while other institutions, with identical purposes and functions, are not required to pay the tax. Plaintiffs assert that the government's sole criterion for the disparate treatment is the plaintiffs' source of funds.

The law is clear that Internal Revenue Code provisions concerning the taxation of charitable organizations do not violate the

Fifth Amendment's due process clause if there is "a reasonable basis for the [tax] classifications" made by Congress. *Taxation With Representation v. United States,* 585 F.2d 1219, 1224 (4th Cir. 1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979). Basically, there are two lines of inquiry that must be made in order to test a statute of this type. The first line of inquiry is whether Congress has a "rational basis" for enacting I.R.C. § 4940. The second, assuming there is a rational basis, is whether the classifications made pursuant to the section rest

> upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.

*Johnson v. Robison,* 415 U.S. 361, 374, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974), quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Thus, a review of the legislative history of I.R.C. § 4940 must be undertaken.

Enacted with the Tax Reform Act of 1969, I.R.C. § 4940 required "private foundations"[1] to pay a four percent (two percent as of 1978) excise tax on their net investment income to provide funds for more vigorous administrative enforcement of the laws governing tax exempt organizations. Prior to 1969, tax exempt organizations paid nothing to cover the costs of examining the finances and activities of the foundation to see that it continued to qualify for exemption. S.Rep. 91–552 at IV, A, 2 ([1969] 2 U.S.Code Cong. & Ad.News 2027, 2053). The aim of I.R.C. § 4940 was to require entities favored by the tax laws to make some "small contribution" toward the administrative costs of overseeing compliance by exempt organizations with those laws. H.R.Rep. 91–413 at I, 1 ([1969] 2 U.S.Code Cong. & Ad.News 1645, 1648). In first proposing § 4940, the House found that

> since the benefits of government are available to all, the costs should be borne, at least to some extent, by all those able

to pay. Your committee believes this is true for private foundations as it is for taxpayers generally. Also, it is clear that vigorous and extensive administration is needed in order to provide appropriate assurances that private foundations will promptly and properly use their funds for charitable purposes. This tax, then, may be viewed as being in part a user fee.

*Id.* at IV, A, 1 ([1969] U.S.Code Cong. & Ad.News at 1663). Apparently, the Senate agreed:

> *General reasons for change.* The committee agrees with the House that private foundations should be subject to substantial supervision, of the type appropriate to their receipt of tax benefits under the Internal Revenue Code. It also agrees that the costs of this supervision should not be borne by the general taxpayer, but rather should be imposed upon those exempt organizations whose activities have given rise to much of the need for supervision. Accordingly, the committee agrees that an annual tax should be imposed upon private foundations.

S.Rep. 91–552, *supra* ([1969] 2 U.S.Code Cong. & Ad.News at 2053).

At that time, tax exempt organizations fell into two groups: those whose supporters could deduct contributions only up to 20 percent of adjusted gross income and those whose supporters faced a more generous 30 percent limitation. The "30 percent" organizations include such organizations as churches, schools, hospitals, and publicly supported charities. Congress borrowed that dividing line, subjecting only the "20 percent organizations" to the I.R.C. § 4940 audit fee because:

> *General reasons for change.* In general, the problems that gave rise to the statutory provisions of the bill discussed above appear to be especially prevalent in the case of some organizations presently in the 20-percent group. However, it appears that certain other organizations presently in the 20-percent category generally do not give rise to the problems

---

1. "Private foundations" are all tax exempt organizations under I.R.C. § 501(c)(3), like plain-tiffs, except four types of congressionally defined public charities. I.R.C. § 509(a).

which have led to the restrictions and limitations described above.

S.Rep. 91–552, *supra* ([1969] 2 U.S.Code Cong. & Ad.News at 2084). Those "20 percent organizations" were defined as "private foundations" and were required to pay the I.R.C. § 4940 audit fee while the "30 percent organizations" were denominated as the public charities protected from the fee. I.R.C. § 509(a). Thus, Congress found that it was the class of "private foundations" that needed scrutiny.

■ At this juncture, the burden rests upon the plaintiffs to demonstrate the falsity of these legislatively-founded facts before this Court could find there is no reasonable or rational basis for the audit fee imposed by I.R.C. § 4940. Plaintiffs, however, have produced no evidence to contradict the Congressional finding that there was a need to audit private foundations and that these same foundations should be required to bear the costs of said audits. Plaintiffs, rather than attempting to assail Congress reasons for imposing the audit fee, submit there is no rational basis for the excise tax for four reasons. First, that because the term "private foundations" has not previously been defined, there is nothing to indicate that homes such as the plaintiffs' would fall into such a category. Second, there has been no evidence produced to show that plaintiffs have spent their funds on anything other than charitable purposes. Third, that there is nothing to indicate that homes for the aged or homes for children constitute organizations whose activities have given rise to need for supervision. Finally, that the Congressional act of reducing the tax from four percent to two percent in 1978 indicates that it lacked a clear idea of what it was doing when it enacted the tax. The above recited contentions do not bear, however, on whether Congress had a rational or reasonable basis for the classification, but rather are more properly considered with respect to this court's second line of inquiry, whether the classification, with respect to the plaintiffs, has a fair and substantial relationship with respect to the object of the statute. Thus, in light of Congress stated reasons for the need and purpose for the tax imposed by I.R.C. § 4940 and plaintiffs failure to demonstrate the falsity of those legislatively-founded facts, this court finds I.R.C. § 4940 to satisfy the rational basis test.

■ As noted above, this court's inquiry does not end here. If plaintiffs can show that the classifications created by I.R.C. § 4940 do not rest upon a ground of difference having a fair and substantial relationship to the object of the statute, then plaintiffs may prevail on their constitutional argument. In essence, plaintiffs argue that they are denied equal protection of the law because they are required to pay, due to their source of funding, the § 4940 tax while numerous other homes for the aged and children's homes, whose source of funding differs from that of the plaintiffs, did not have to pay the tax. Thus, plaintiffs contend, that if the purpose of the tax is to check the abuses of various charitable foundations, then distinguishing between plaintiffs and other old age and children's homes on the basis of funding cannot be said to have a fair and substantial relation to the object of the legislation. Plaintiffs' statement, however, flies squarely in the face of Congress expressed finding that the abuses the tax sought to prevent were "especially prevalent in the case of some organizations presently in the twenty percent group". S.Rep. 91–552, *supra*, ([1969] 2 U.S.Code Cong. & Ad.News at 2084). Plaintiffs only argument could be that Congress can not permissibly impose the I.R.C. § 4940 audit fee on all "private foundations" given its finding that not all "twenty percent organizations" gave rise to the problems Congress sought to prevent. There is no merit in this contention, however, because such legislative fine-tuning is neither attainable nor required by the rational relationship test of the due process clause. Congress identified certain problems with many of the "twenty percent organizations" and consequently enacted a statute, which this court has found to have a reasonable and rational relationship to those problems, in order to deal with those problems. It may well be, as Congress apparently perceived, that only a por-

tion of the class of "private foundations" exhibits behavior warranting examination. Congress, however, may create classifications that subject certain class members to arguably needless or wasteful remedies so long as Congress observes certain problems with the class as a whole. *See, Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 487, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). As the Supreme Court there noted, for due process purposes

> [I]t is enough that there is an evil at hand for correction and that it might be thought that the particular legislative measure was a rational way to correct it.

*Id.* at 488, 75 S.Ct. at 464. Thus, the equal protection guarantee of the due process clause cannot be used to strike down the federal legislative classification solely on the ground that the classifications are capable of improvement. *Mildner v. Gulotta*, 405 F.Supp. 182, 194 (2nd Cir. 1975) (three Judge court), aff'd mem., 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976).

■ Because Congress perceived difficulties calling for examination of the class of "private foundations" as a whole, there exists a rational basis for requiring the class as a whole to pay part of the cost of audit. Given the rational Congressional distinction between "private foundations" and other tax-exempt organizations, there is no relevance in plaintiffs' evidence that their services are comparable to those of other homes which are not "private foundations". Thus, plaintiff's have failed to show that the classifications created by I.R.C. § 4940 do not rest upon a ground of difference having a fair and substantial relationship to the object of the statute. Finding I.R.C. § 4940 constitutionally valid, the court next turns to the Williams Home contention that it qualifies as a "public foundation" under I.R.C. § 509(a) by virtue of the fact that it meets the "facts and circumstances" test forth in Treasury Regulation § 1.170 A–9(e)(3).

■ The Internal Revenue Code defines a publicly supported organization as one which normally receives a substantial part of its support (exclusive of income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501(a)) from a governmental unit ... or from direct or indirect contributions from the general public. I.R.C. § 170(b)(1)(A)(vi). Treasury Regulations have been promulgated pursuant to this statute in order to set forth uniform guidelines for its implementation. Treasury Regulations, § 1.170 A–9, 26 C.F.R.

Under the Regulations, an organization is "publicly supported" only if it can meet one of two tests: either (1) it must receive at least ⅓ of its total support during the test period either from the Government or from direct or indirect public contributions; or (2) it must receive at least 10 percent of its total financial support during the same period from those same sources, but also maintain "a continuous and bona fide program for solicitation of funds from the general public," and demonstrate certain other "facts and circumstances". Treasury Regulations §§ 1.170 A–9(e)(2) and (e)(3). Neither the Williams Home nor the Miller Home purport to satisfy the first, or "mechanical" test. In addition, the Miller Home has stipulated that it did not meet the "facts and circumstances test" for any of the years in issue. The Williams Home, however, contends that it satisfied the "facts and circumstances" test for all relevant years.

All applicants to the Williams Home are required, as part of the admissions application, to provide detailed written statements of all money and property, real and personal, except tangible personal property, owned by the applicant. Failure to provide such a statement constitutes grounds for expulsion. As an absolute prerequisite to admission to the Williams Home, all applicants are required to convey all disclosed assets, except tangible personal property and $250.00 to the Williams Home. The Williams Home takes this property free of all claims except for three specific obligations: (1) to place the conveyed assets into a bank "trust account" from which the resi-

dent receives the annual net income; (2) to return the conveyed assets to the resident if she withdraws from the Williams Home, but only "after deduction of an amount equal to her per Guest cost during the time when she was in the Home ..."; and (3) to provide the resident "with a room of her own, board, and such other facilities and care as it furnishes, from time to time, other Guests." In essence, an applicant to the Williams Home is required to turn over all of her assets to a trust for her benefit for life, and name the Williams Home as beneficiary, in order to obtain admission to the Home. In addition, Williams Home residents, as a condition of admission, are required to execute wills naming the Home "exclusive beneficiary" of all her assets but for tangible personal property. The Williams Home admits that it cannot meet the 10 percent portion of the "facts and circumstances" test if the assets conveyed to the Williams Home by the "Guests" do not constitute "support from the general public". Both the Internal Revenue Code and the Treasury Regulations provide that an organization cannot count as a contribution any

> income received in the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under Section 501(a).

I.R.C. § 170(b)(1)(A)(vi); *see* Treasury Regulations § 1.170A–9(e)(7). In other words, a tax-exempt organization's "contributions" do not include money acquired in exchange for performing the very tasks for which the organization was created and for which it received a tax exemption. Such money is referred to as "exempt function income" and cannot count as part of "public support". *Home for Aged Men v. United States*, 80–2 U.S.T.C. para. 9711 (N.D.W.Va. 1980), aff'd *per curiam*, 665 F.2d 1040 (4th Cir. 1981). The defendant contends that all money either conveyed or bequeathed to the Williams Home as a condition of admission constitutes exempt function income and consequently cannot count as public support for purposes of the "facts and circumstances" test. The Williams Home argues that

this contention is invalid for three reasons. The first is that there is no minimum dollar amount required in order for an elderly woman to become a resident at the Williams Home. In fact, the Williams Home submits, it has admitted residents with no assets at all. The second is that whatever funds the potential resident has are placed in trust for her benefit, whereby she receives all the income from the trust for the rest of her life and in fact is able to invade the corpus of the trust if the need for medical care arises. The Williams Home stresses that it receives no economic benefit from the conveyance in trust until the "Guest's" death. The third reason is the fact that the funds bequeathed to the Williams Home from the estates of the deceased "Guests" are includable in the gross estate of such a decedent, and said estate would be entitled to a charitable deduction. The Williams Home submits that this fact is further evidence that the money should be considered gifts, rather than exempt function income.

In *Home For Aged Men, supra,* the Fourth Circuit Court of Appeals affirmed and adopted the District Court opinion holding that the money obtained by the home from its residents as a prerequisite to admission both at the time of admission and at the death of the resident by his request, constituted "exempt function income". Specifically, the District Court held that it was

> not bound to accept the plaintiff's characterizations of monies received from admittees as solely for the support of the organization. This Court is more influenced by the fact that monies are received from admittees as a prerequisite for admittance.

80–2 U.S.T.C. at 85, 332. That Court additionally noted that its opinion was influenced by one of the home's rules that, upon the withdrawal of a resident, his conveyed assets would be returned to him minus a fee for maintaining him during the period of his residence. This is a rule that this court notes is remarkably similar to one which the Williams Home adheres. This court can

find no other purpose behind the Williams Home's rules regarding bequests and conveyances other than to assure the Williams Home receives all assets of its residents, except personal property.

The Williams Home attempts to distinguish the facts of its case from that of the *Aged Men* case by pointing to the fact that the Home for Aged Men had a minimum monetary requirement of $500.00 for one to become a resident, while the Williams Home has no minimum requirement. This court finds that distinction insufficient to overcome the other markedly similar facts between these two cases. This is particularly true in light of the fact that a Williams Home resident, indigent at the time of admission, is still required to transfer to the Home any assets acquired subsequent to admission. It is also worth noting that only Williams Home residents with assets to convey and bequeath are counted by the Williams Home as public "contributors". Since the "public support" regulation require a focus only upon "contributors" and not upon other individuals, the sole relevant fact found in the admission policy of the Williams Home is that residents transfer their assets at the insistence of the Home and not due to any disinterested generosity. This court also finds no merit in the Williams Home contention that the assets received from its residents constitute "membership fees" pursuant to Treasury Regulation § 1.170A–9(e)(7)(iii), in light of the mandatory nature of the transfer of assets. Finally, the Williams Home's contention that bequests by residents are charitable contributions and therefore part of "public support" ignores the long-standing rule that assets assigned to a Home as a condition of admission do not constitute "contributions". Revenue Ruling 59–401, 1969–2 Cum. Bulletin 128. This court's finding, that the Williams Home fails to meet the 10 percent public support portion of the "facts and circumstances" test, renders it unnecessary for the court to determine whether the Williams Home meets the remaining criteria of the "facts and circumstances" test.

Both the Williams Home and the Miller Home next contend that notwithstanding the Treasury Regulations promulgated pursuant to I.R.C. § 170(b)(1)(A) and I.R.C. § 509(a), they are "publicly supported" organizations within the meaning of I.R.C. § 170(b)(1)(A)(vi), and to the extent that a contrary conclusion could be made under the Treasury Regulations, said Regulations are invalid. Plaintiffs say that while they may not be exempt from private foundation status under I.R.C. § 509(a)(2), they are, nevertheless, exempt from such status by being publicly supported charities under I.R.C. § 509(a)(1), which is to say an organization described in I.R.C. § 170(b)(1)(A)(vi). In essence, plaintiffs contend that the "facts and circumstances" test is invalid in that the various tests for determining whether an organization is a "public foundation" exceed the scope of the law as enacted by Congress. In other words, plaintiffs say that Treasury Regulation § 1.170A–9(e)(3) overly constricts the statutory provision with regard to public support found in I.R.C. § 170(b)(1)(A)(vi).

Plaintiffs concede that Congress delegated the authority to the Secretary of the Treasury to prescribe rules and regulations for the enforcement of the Internal Revenue Code under 26 U.S.C. § 7805(a), but assert that a regulation may not enlarge or constrict the scope of a tax statute. *Pennsylvania National Bank v. United States*, 387 U.S. 213, 87 S.Ct. 1573, 18 L.Ed.2d 726 (1967). Plaintiffs insist that nowhere in the legislative history of I.R.C. § 170(b)(1)(A)(vi) can one find an indication that Congress intended to limit the terms "normally receives a substantial part of its support ... from direct or indirect contributions from the general public ...". Thus, they argue that the regulation improperly enlarges the scope of the tax of I.R.C. § 4940 by restricting the meaning of "public support" by adding the 10 percent dollar-support requirement to the "facts and circumstances" test. The plaintiffs say that because the Code does not itself suggest a specific percentage requirement in describing "publicly supported" organizations and because prior "public support" regulations do not require that level of contribution, then the regulation is invalid.

Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes" they interpret. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Furthermore, such regulations must be upheld if they reasonably implement the legislative mandate. *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 476–477, 99 S.Ct. 1304, 1306–1307, 59 L.Ed.2d 519 (1979). Congress specified that, to fall into the favorable "publicly supported" tax category, an "organization must receive support from at least a representative number of persons within the community concerned". H.R. Rep. 749 at 9(c) ( [1964] 1 U.S.Code Cong. & Ad.News at 1361–1362). The requirement that at least 10 percent of an organization's support come from the general public in order to be free from the excise tax clearly and reasonably effectuates the legislative intent in an entirely permissible manner. *See, Home For Aged Men v. United States, supra.* The Congressional intent in granting special tax status to "publicly supported" organizations was to assure not so much that the entity had substantial contributions but rather numerous contributors. *Legg v. Commissioner,* 57 T.C. 164, 173 (1971), aff'd mem., 496 F.2d 1179 (9th Cir. 1974).

In their final attempt to obtain a refund of taxes paid pursuant to I.R.C. § 4940, both plaintiffs contend that they qualify as "churches" pursuant to I.R.C. § 170(b)(1)(A)(i), and § 509(a)(1). Essentially, the plaintiffs argue that they carry out the functions of a church and thus should be considered churches under the Internal Revenue Code. The Miller Home contends that it has a very distinct fellowship of people caring for each other, that it provides regular worship and spiritual education by means of daily morning Bible studies, and that every Wednesday a local minister is invited into the Home to counsel the girls with regard to both religious and non-religious problems. The Williams Home states that its inhabitants exhibit a close-knit fellowship of people caring for and helping each other, that the Home pro-vides organized worship for its residents, and that there are regular weekday study groups available.

No where in the Internal Revenue Code is the term "church" defined. It does appear, however, that the term "church" is a concept with a somewhat restricted meaning for Federal tax purposes. *American Guidance Foundation, Inc. v. United States,* 490 F.Supp. 304, 306 (D.D.C.1980), aff'd mem., No. 80–1855 (D.C.Cir. July 10, 1981); *Chapman v. Commissioner,* 48 T.C. 358, 363–364 (1967). The court in the *American Guidance Foundation, Inc., supra* at 306 n.2. lists the following factors by which an organization is to be assessed in seeking status as a church:

(1) a distinct legal existence;

(2) a recognized creed and form of worship;

(3) a definite and distinct ecclesiastical government;

(4) a formal code of doctrine and discipline;

(5) a distinct religious history;

(6) a membership not associated with any other church or denomination;

(7) an organization of ordained ministers;

(8) ordained ministers selected after completing prescribed studies;

(9) a literature of its own;

(10) established places of worship;

(11) regular congregations;

(12) regular religious services;

(13) Sunday school for religious instruction of the young;

(14) schools for the preparation of its ministers.

While it is clear that not all of these factors need be present in an organization seeking status as a "church" for Federal tax purposes, it is equally clear that neither plaintiff constitutes a "church" when assessed in light of these factors. Other than possessing a distinct legal existence, and perhaps an established place of worship and regular religious services, neither plaintiff possesses any of the other factors. The Executive Director of the Williams Home testified that on any given Sunday, 95 percent of the

residents are out of the Home attending services at a number of different churches. She also stated that the Williams Home had no regular congregation of worshipers. Somewhat similarly, the Executive Director of the Miller Home testified that no member of the public has ever come to any religious function conducted at the Home. The evidence clearly shows that plaintiffs are ecumenical organizations not affiliated with nor governed by any established church nor can they be said, for Federal tax purposes, to be "churches" in their own right.

While holding that the plaintiffs have failed to state grounds entitling them to a refund, the court is not without compassion for plaintiffs' plight. It appears to the court that, in every respect, plaintiffs operate benevolent institutions in an exemplary fashion. It is not, however, within this court's prerogative to grant relief where the law does not allow it. The more nearly proper mode of redress, to give the plaintiffs the relief this court might like to bestow, is by way of Congressional action.

For all of these reasons, an appropriate Order will this day issue entering judgment in favor of the defendant.