CANTON POLICE BENEVOLENT
ASSOCIATION OF CANTON,
OHIO, Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 87–3230.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 11, 1988.

Decided April 19, 1988.
Rehearing and Rehearing En Banc
Denied June 7, 1988.

Paul A. Tscholl, Canton, Ohio, John A. Tscholl, argued, for plaintiff-appellant.

John M. Siegel, Steven D. Bell, Asst. U.S. Atty., Cleveland, Ohio, Marilyn A. Bobula, J. Wm. Sikora, Susan M. Poswistilo, Tax Div., Robert S. Pomerance, Janet K. Jones, argued, Tax Div.—Dept. of Justice, Washington, D.C., for defendant-appellee.

Before MERRITT and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

The Canton Police Benevolent Association of Canton, Ohio ("Association") brought this action in the United States District Court for the Northern District of Ohio seeking a refund of $3,367.02 in federal income taxes for the years 1981 through 1984. The Association alleged that the Internal Revenue Service ("IRS") improperly

revoked its status as a tax-exempt organization under Section 501(c)(9) of the Internal Revenue Code. In addition, the Association moved for its attorney's fees under Rule 11 of the Federal Rules of Civil Procedure, alleging that the government's attorney failed to timely inform herself of the facts and law of the case. The parties filed cross-motions for summary judgment. On February 3, 1987, the district court entered a memorandum opinion and order granting summary judgment to the government, and, on the following day, entered an order dismissing the complaint. After the district court denied its motion for reconsideration, the Association filed notice of appeal to this court. We affirm the judgment of the district court.

## I. *Factual Background*

The Association is a not-for-profit membership organization formed in 1962. Membership in the Association is open only to employees of the Canton Police Department in active service. The main purposes of the Association are to promote a fraternal spirit among its members, and to extend moral and material aid to them (and to their dependents) upon their death or retirement from the police force.

The Association pays a "dividend" to a member if he retires from the police department with twenty years of service, or if he dies while working for the department. If a member retires with less than twenty years on the force, the benefit paid by the Association is reduced. During 1981 through 1984, the years in issue, the money to fund death and retirement payments came from dues and assessments levied against the members, from donations, and from interest on the Association's bank accounts. During those years, the Association made twenty payments on account of retirements and three payments on account of deaths; most of the payments were of $4,200 or $4,500 each. The retirement payments added up to more than 85% of the Association's overall expenditures for that period.

In 1964, the IRS recognized the Association as a "social welfare" organization exempt from income taxation under Section 501(c)(4) of the Internal Revenue Code. In February, 1980, the IRS determined that the Association no longer qualified under Section 501(c)(4) but that it did qualify for tax-exempt status under Section 501(c)(9) of the Code.

Section 501(c)(9) accords tax-exempt status to "voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents...." 26 U.S.C. § 501(c)(9) (1954). On July 17, 1980, not long after the Association received a favorable administrative ruling under Section 501(c)(9), the Treasury published in the Federal Register, for public comment, a proposed regulation interpreting that statute. The regulation was issued in final form and became effective in January of 1981. Treas.Reg. § 1.501(c)(9) (1981). Invoking the principle of *ejusdem generis* (i.e., that a general word in a statute, contract, or will takes its meaning from the specific words with which it appears), the regulation provides that "[t]he term 'other benefits' [as used in Section 501(c)(9)] includes only benefits that are similar to life, sick, or accident benefits." Treas.Reg. 1.501(c)(9)–3(d) (1981). "A benefit is similar to a life, sick, or accident benefit," the regulation continues, if: (1) the benefit "is intended to safeguard or improve the health of a member or a member's dependents," or (2) the benefit "protects against a contingency that interrupts or impairs a member's earning power." *Id.*

The regulation then gives examples of benefits that qualify as "other benefits" for purposes of the statute, and examples of benefits that do not so qualify. With reference to benefits in the nonqualifying category, the regulation states the following:

> The term "other benefits" does not include any benefit that is similar to a pension or annuity payable at the time of mandatory or voluntary retirement, or a benefit that is similar to the benefit provided under a stock bonus or profit-sharing plan. For purposes of section

501(c)(9) and these regulations, a benefit will be considered similar to that provided under a pension, annuity, stock bonus or profit-sharing plan if it provides for deferred compensation that becomes payable by reason of the passage of time, rather than as the result of an unanticipated event. Thus, for example, supplemental unemployment benefits, which generally become payable by reason of unanticipated layoff, are not, for purposes of these regulations, considered similar to the benefit provided under a pension, annuity, stock bonus or profit-sharing plan.

Treas.Reg. § 1.501(c)(9)–3(f) (1981). As a corollary to the foregoing, the regulation specifies that "[t]he term 'life benefit' [as used in the statute] does not include a pension, annuity, or similar benefit." Treas.Reg. § 1.501(c)(9)–3(b) (1981).

On the authority of that regulation, the IRS in 1984 revoked the Association's exemption under Section 501(c)(9). The examining agent's report explained that " '[t]he term other benefits does not include any benefit that is similar to a pension, or annuity payable at the time of mandatory or voluntary retirement.' " The report concluded that "[t]he providing of retirement benefits to [the Association's] members upon retirement or separation from service do[es] not qualify as benefits permitted or embraced under section 501(c)(9)." The revocation was effective retroactively—as of January 1, 1981, "the first day of the taxable year in which the [regulation] became final." The Association was directed to file federal income tax returns for 1981 and later years.

The Association filed returns and paid taxes for 1981 through 1984. It thereafter submitted administrative claims for refund of those taxes "on the grounds that [it] qualifie[s] an an exempt organization and its income [is] not subject to income taxes under 26 U.S.C. § 501(c)(9)." When the IRS denied the refund, the Association brought this action in the district court in April of 1986.

The IRS timely submitted its answer. The answer admitted some of the allegations in the complaint and denied others. As to still others, the answer stated that the government was then "without knowledge or information sufficient to form a belief as to the[ir] truth." A pretrial conference was held in July of 1986. Pursuant to that conference, the district court set up a schedule for the parties to file cross-motions for summary judgment.

The Association thereafter moved for summary judgment, claiming that it is entitled to an exemption under Section 501(c)(9). It also moved for attorney's fees and to strike several portions of the government's answer—the portions in which the government stated that it lacked sufficient knowledge to admit or deny particular allegations in the complaint. The Association contended that, under Rule 11 ofthe Federal Rules of Civil Procedure, the government's attorney was chargeable, at the time she drafted the answer, with knowledge of all the facts in the administrative record compiled by the IRS, and that her failure to learn all those facts before preparing the answer amounted to "a fraud upon the Court." The Association further alleged that government counsel went to the pretrial conference without adequate preparation. The government opposed all of the Association's motions and filed a cross-motion for summary judgment.

The district court, 658 F.Supp. 411, held for the government on all issues. First, the court denied the motions to strike and for attorney's fees. The court explained its reasoning this way:

In this action, the plaintiff asserts that the Government's counsel is charged under Rule 11 [of the Federal Rules of Civil Procedure] with all knowledge of the facts possessed by the Internal Revenue Service at the time of her filing the answer.... Thus, following the plaintiff's view, the Government's counsel could never deny an allegation in its answer for want of knowledge unless and until all of the Government's resources were first reviewed by counsel. The court finds that such a burden upon the Government could never be imposed at

the time of answering a complaint, nor does the reasonable inquiry requirement of Rule 11 mandate such a review by counsel.

Second, the district court granted the government's motion for summary judgment, concluding that the evidence of record "do[es] not present any material factual inconsistencies," and establishes that "the revocation of tax exempt status by the Internal Revenue Service was proper." The court noted that the Association's payment of retirement dividends accounted for more than 80% of its total disbursements during 1981–1982, and was found by the IRS to be its "primary function." "The critical inquiry," the court explained, "is whether [the Association's] primary expenditures"—its expenditures for retirement dividends—"are for payment of 'life, sick, accident, or other benefits'" within the meaning of Section 501(c)(9). The Association conceded that a retirement payment is not the same as a "life, sick [or] accident" benefit but argued that a retirement payment can qualify as an "other benefit" for purposes of the statute.

The district court rejected that argument as "directly in conflict" with the applicable regulation. The court observed that Treasury Regulation 1.501(c)(9)–3(d) "defines the term other benefits to 'include only benefits that are similar to life, sick or accident benefits'"—a definition which the court took to be "a reasonable interpretation of the statutory scheme."

## II. *Revocation of the Association's Tax–Exempt Status*

The Association asserts four separate arguments in support of its contention that the IRS was without authority to revoke its tax exemption. First, the Association avers that the dividends it paid to retiring members were really severance pay —not retirement benefits. Second, the Association argues that its tax-exempt status was not jeopardized by payment of retirement dividends since the Association is not funded by the City of Canton. Third, the Association contends that the dividends were not retirement *benefits* but merely retire-

ment *rebates* of each member's cumulative annual assessments. And finally, the Association maintains that the IRS was without authority to revoke its long-standing tax-exemption since there was no intervening change in Section 501(c)(9). We reject each of these arguments.

### A.

■ The first argument asserted by the Association is that the district court erred in concluding that the "dividends" paid by the Association to its members were pension or annuity benefits when they were, in reality, "severance pay." Under Treasury Regulation 1.501(c)(9)–3(e), "severance pay" is specifically included in the category of "other benefits" under Section 501(c)(9). Consequently, if the Association's dividends to its members were severance pay rather than retirement benefits, the Association would be entitled to tax-exempt status under Section 501(c)(9). An analysis of the applicable law, however, leads to the conclusion that the dividends were *not* severance pay.

Treasury Regulation 1.501(c)(9)–3(e) provides that "severance pay" for purposes of this section shall be the same as it is defined in the labor regulations—specifically, 29 C.F.R. § 2510.3–2(b). That section requires, *inter alia*, that "such payments [i.e., severance pay] are not contingent, directly or indirectly, upon the employee's retiring." 29 C.F.R. § 2510.3–2(b)(i). In the instant case, however, unless the person dies while employed by the Canton Police Department, he must retire in order to receive a "dividend." Consequently, the payment plan established by the Association has, as a condition for the receipt of a dividend, the police officer's retiring from the force. The dividend payment, therefore, is not "severance pay" as defined in 29 C.F.R. § 2510.3–2(b)(i), and, accordingly, the payment of such dividend does not exempt the Association from taxation under Treasury Regulation 1.501(c)(9)–3(e).

### B.

The Association carefully explains to this court that the "dividend plan" it estab-

lished is not funded in any way by its members' employer—the City of Canton. Rather, the retirement dividends are funded by membership assessments, contributions, and bank interest. It is simply irrelevant, however, that the dividend program is not funded by the City of Canton. Treasury Regulation 1.501(c)(9)–2(a)(2)(ii)(A) clearly indicates that employer-funded organizations can also qualify for tax-exempt status under Section 501(c)(9). If employer-funded organizations can qualify for tax-exempt status, the mere fact that an organization is not employer-funded does not, *ipso facto*, establish under the regulations that the organization is entitled to tax exemption. The Association cites us to no statutory or case law to support its assertion that the fact that the City of Canton does not fund the retirement program, standing alone, entitles it to tax-exempt status.

### C.

The Association also contends that it is entitled to tax-exempt status because it merely pays back the membership dues of retiring members at the time of their retirement. Like the immediately preceding argument, however, the Association cites us to no regulations, code sections, or case law to support its assertion that, if it were merely repaying retiring members' dues, it would be entitled to tax exemption.

We need not decide, however, whether, under such a plan, the Association would be entitled to tax exemption because the Association failed to tender to the district court any affidavits or other evidence, as required by Federal Rule of Civil Procedure 56(e),[1] to support its assertion, in its memorandum in support of its motion for reconsideration,[2] that the retirement dividend was merely a rebate of each member's dues. Indeed, the only evidence produced by the Association bearing on its averment that the retirement dividends were merely rebates of its members' individual assessments contradicts the Association's position. The Association's Annual Trustee's Report shows that the retirement benefits were paid from a fund made up of assessments, *contributions*, and *bank interest*—not assessments alone. The implication of this report is that each retirement payment was composed, not only of the retiring member's lifetime assessments, but of outside contributions and interest as well.

### D.

■ From 1964 to 1980, the IRS gave the Association tax-exempt status under Section 501(c)(4) as a "social welfare" organization. In 1980, the IRS determined that the Association only provided for the welfare of its membership, and, therefore, changed the Association's tax-exempt status to Section 501(c)(9)—the subsection covering "voluntary employee beneficiary associations." The Association did not and does not contest this change. The Association does argue, however, that, since Section 501 was not revised from 1964 to 1984, there is no statutory basis for the IRS to revoke the tax-exempt status under which it has operated since 1964. We disagree.

Section 7805(a) of the Internal Revenue Code grants the Secretary of the Treasury power to "prescribe all needful rules and regulations for the enforcement of this title...." 26 U.S.C. § 7805(a) (1954). And it is familiar law that interpretive rulings by the Treasury, "if found to 'implement the congressional mandate in some reasonable manner,' must be upheld." *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Thus, if the Secretary's interpretive ruling found in Treasury

---

**1.** Federal Rule of Civil Procedure 56(e) provides, in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**2.** The issue was not raised in the complaint.

Regulation 501(c)(9)–3 implements Section 501(c)(9) in a reasonable manner, it is sufficient intervening law to permit the IRS to revoke the Association's tax-exempt status. We conclude that Treasury Regulation 1.501(c)(9)–3 does reasonably implement Section 501(c)(9).

Section 501(c)(9) provides for the tax-exemption of voluntary employee beneficiary associations which provide "life, sick, accident, or other benefits." Treasury Regulation 1.501(c)(9)–3(d) provides that "[t]he term 'other benefits' [as used in the statute] includes only benefits that are similar to life, sick, or accident benefits." "A benefit is similar to a life, sick, or accident benefit," the regulation continues, if: (1) the benefit "is intended to safeguard or improve the health of a member or a member's dependents," or (2) the benefit "protects against a contingency that interrupts or impairs a member's earning power." Treas.Reg. § 1.501(c)(9)–3(d) (1981). The regulation then specifies that, under those standards, "[t]he term 'other benefits' does not include any benefit that is similar to a pension or annuity payable at the time of mandatory or voluntary retirement." Treas.Reg. § 1.501(c)(9)–3(f) (1981).

There are three reasons that Treasury Regulation 1.501(c)(9) is a reasonable construction of Section 501(c)(9). In the first place, the regulation is consistent with the time-honored rule of *ejusdem generis,* i.e., that a general word in a statute takes its character from the specific words with which it appears. In the instant case, Section 501(c)(9) speaks specifically of "life, sick, and accident" benefits. The addition of the more general term "other benefits" in Section 501(c)(9) should be construed, under the doctrine of *ejusdem generis,* as referring to "other benefits" *similar to life, sick, or accident benefits* in order to prevent giving the statute unintended breadth.

Second, the Treasury's interpretation of "other benefits" draws support from Section 401 of the Internal Revenue Code. This section (in conjunction with Section 501(a)) provides a tax exemption specifically for qualifying retirement plans; and the

restrictions imposed by section 401 are rigorous. If an organization paying retirement benefits could obtain an exemption under Section 501(c)(9) rather than under Section 401 on the theory that retirement payments constitute "other benefits," it would be a relatively easy matter to avoid the detailed requirements of Section 401—a result that Congress never intended.

Finally, only recently Congress added a statutory restriction applicable to associations seeking exemption under Section 501(c)(9). In so doing, Congress examined the pertinent provisions of the regulations under Section 501(c)(9), endorsed them, and left them fully intact. *See* H.R.SUPP.REP. NO. 98–432 (Part 2), 98th Cong., 2d Sess. 1285–1287 (1984), U.S.Code Cong. & Admin. News 1984, 697. *Accord,* SENATE COMM. ON FINANCE, 98TH CONG., 2D SESS., EXPLANATION OF PROVISIONS APPROVED BY THE COMMITTEE ON MARCH 21, 1984 (Vol.1) 317 (Comm.Print 1984); STAFF OF JOINT COMM. ON TAXATION, 98TH CONG., 2D SESS., GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984, 796–797 (Comm.Print 1984).

We conclude that Treasury Regulation 1.501(c)(9) is a reasonable construction of Section 501(c)(9), entitled to the weight of law. This regulation, then, serves as the intervening change in law that became effective in 1981 on which the IRS properly based its revocation of the Association's tax-exempt status.

### III. *Retroactivity of the Revocation*

The Association next contends that, if the IRS was properly able to revoke its tax-exempt status, the IRS was still not able to make that revocation retroactive. The IRS issued its report revoking the Association's tax-exempt status in 1984, but made the revocation retroactive to 1981, the year in which the regulation became effective. The Association was required to file tax returns and pay taxes for years 1981 through 1984.

Section 7805(b) of the Internal Revenue Code provides that the decision on whether

or not to make a tax ruling or regulation retroactive is left to the sound discretion of the Secretary of the Treasury. 26 U.S.C. § 7805(b) (1954). The Secretary's decision will not be reversed unless it amounts to an abuse of discretion. *Automobile Club of Michigan v. Comm'r*, 353 U.S. 180, 184, 77 S.Ct. 707, 710, 1 L.Ed.2d 746 (1957); *Old Dominion Box Co. v. United States*, 477 F.2d 340 (4th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

In *Dickman v. C.I.R.*, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), the Supreme Court was presented the issue of whether the IRS Commissioner could change an existing interpretation of a tax law and give that changed interpretation retroactive effect. The plaintiffs argued that the Commissioner's retroactive application of the changed interpretation of the tax law should be held an abuse of discretion since they detrimentally relied on the original, long-standing interpretation of the law in planning their financial affairs. The Court disagreed, holding that:

> [I]t is well established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. E.g., *Dixon v. United States*, 381 US 68, 72–75, 14 L Ed 2d 223, 85 S Ct. 1301 [1304–1306] (1965); *Automobile Club of Michigan v. Commissioner*, 353 US 180, 183–184, 1 L Ed 2d 746, 77 S Ct 707 [709–710] (1957). This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. *Dixon v. United Sates*, supra, at 73, 14 L Ed 2d 223, 85 S Ct 1301 [1304]. The Commissioner is under no duty to assert a particular position as soon as the statute authorizes such an interpretation. See also *Bob Jones University v. United States*, 461 US 574, 76 L Ed2d 157, 103 S Ct 2017 (1983). Accordingly, petitioners' "taxpayer reliance" argument is unavailing.

*Id.* at 343, 104 S.Ct. at 1094 (footnotes omitted). Clearly, if the Commissioner can retroactively apply a changed interpretation of a tax law, the Secretary can, in the instant case, retroactively revoke the Association's tax exemption to the date of the Association's initial violation of an *existing regulation*. In the present case, the Association cannot even make the good-faith, detrimental reliance argument raised by the plaintiffs in *Dickman* since the revocation was retroactively applied only to the effective date of the regulation which controlled the Association's continued entitlement to its tax exemption.

The Association cites this court to *Pittsburgh Press Club v. United States*, 615 F.2d 600 (3d Cir.1980), in which the Third Circuit held that the Commissioner's decision to revoke the tax-exempt status of a voluntary employee organization was an abuse of discretion. In *Pittsburgh Press*, the Commissioner, after an IRS audit of the organization's accounts, notified the organization that its tax-exempt status might be revoked for engaging in certain for-profit activities not mentioned in the organization's original exemption application. The Commissioner subsequently revoked the organization's tax exemption, making the revocation retroactive to the tax year in which the organization first engaged in the impermissible activities.

The Third Circuit held that the Commissioner abused his discretion in making the revocation retroactive to the year in which the organization first engaged in the impermissible activities. The court, however, did not disclose its reasoning beyond citing *Lesavoy Foundation v. Comm'r*, 238 F.2d 589 (3d Cir.1956).

In *Lesavoy*, the Third Circuit held that, if an organization detrimentally and in good-faith relies on a tax-exemption and does not misrepresent the nature of its activities to the IRS, it is an abuse of discretion for the Commissioner to retroactively revoke the organization's tax exemption based on those activities. *Id.* at 590–93. Obviously, the Supreme Court's decision in *Dickman v. Comm'r*, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), casts serious doubt on the continuing validity of at least that portion of *Lesavoy* which holds that good-faith, detrimental reliance on a tax exemption is a basis for denying retroactive application of a subsequent revocation.

We need not determine, however, whether the Third Circuit's holding in *Lesavoy* has any continuing validity after *Dickman*, since the instant case is clearly distinguishable from *Lesavoy* and *Pittsburgh Press*. In both of those cases, there was no intervening change in the tax regulations to signal the organizations that their tax-exempt status was in jeopardy. In the instant case, on the other hand, the Association had at least constructive notice, after Treasury Regulation 1.501(c)(9) became effective in January of 1981, that the IRS had a regulatory basis to revoke its tax-exempt status. It is not unfair, therefore, for the Secretary to have decided to make the revocation retroactive to the effective date of the new regulation. It simply cannot be said that such decision amounted to an abuse of discretion.

### IV. *Denial of Sanctions*

█ The Association lastly contends that the district court abused its discretion in denying its motion for sanctions against the government based on claimed deficiencies in the government's counsel. Specifically, the Association contends that the attorney for the government violated Rule 8 of the Federal Rules of Civil Procedure by dishonestly denying the allegations made by the Association in its complaint. Additionally, the Association argues that the government's attorney violated Rule 11 by not making a "reasonable inquiry" into the facts of the case before filing her answer. And finally, the Association contends that the government's attorney violated Rule 16 by being unprepared at the pretrial conference. We reject these contentions.

With regard to its first claim of attorney misconduct, it appears from the government's Answer that its attorney made only one denial—namely, that the IRS illegally revoked the Association's tax-exempt status. We have already determined, however, that this denial was correct. Consequently, the attorney did not engage in any dishonesty by making that representation.[3]

The Association's argument that the government's attorney violated Rule 11 of the Federal Rules of Civil Procedure by not making a reasonable inquiry into the facts of the case before filing her answer is also without merit. The Association's contention appears to be that the attorney was required to come into possession of and read all of the files in the IRS's control during the sixty-day period in which she had to file her answer.

As the district court suggested, however, an attorney for one government agency (here, the Justice Department) may not be able, even with the exercise of due diligence, to obtain files in the hands of another government agency before the answer is due. This fact of litigation has been recognized by other courts as well. *See Ashburn v. United States*, 740 F.2d 843, 845–46, 850 (11th Cir.1984).

In the instant case, it appears that the attorney for the government was unable to procure the files from the IRS in time to respond knowledgeably to many of the allegations made in the Association's complaint. Consequently, she took the permissible tack of stating in her answer that she had insufficient knowledge of the disputed facts to admit or deny them. *See* FED.R. CIV.P. 8(b). The district court's decision to deny sanctions on this ground was accordingly not an abuse of discretion.

The Association's final argument for sanctions is that the attorney for the government was unprepared when she arrived at the scheduled pretrial conference knowing "nothing about the case and refus[ing] to discuss it at all." There is no record to support this claim in this court, and, consequently, we cannot determine the correctness of the district court's ruling. Moreover, even if we had such record, this is an issue, the resolution of which, would be particularly within the discretion of the district court.

### V. *Conclusion*

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**3.** Even if the Association had been successful on the merits, the issue was certainly close enough that the attorney's denial would not have been frivolous or dishonest.