# NATIONAL MUFFLER DEALERS ASSN., INC. v. UNITED STATES

No. 77–1172.   Argued November 27, 1978—Decided March 20, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. STEWART, J., filed a dissenting opinion, in which REHNQUIST and STEVENS, JJ., joined, *post,* p. 489.

*Myron P. Gordon* argued the cause for petitioner. With him on the briefs was *Monte Engler.*

*Stuart A. Smith* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Ferguson, Leonard J. Henzke, Jr.,* and *Robert T. Duffy.**

---

*\*Robert J. Sisk* and *David R. Tillinghast* filed a brief for the Pepsi-Cola Bottlers Assn., Inc., as *amicus curiae* urging reversal.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Petitioner, National Muffler Dealers Association, Inc. (Association), as its name indicates, is a trade organization for muffler dealers. The issue in this case is whether the Association, which has confined its membership to dealers franchised by Midas International Corporation (Midas), and its activities to the Midas muffler business, and thus is not "industrywide," is a "business league" entitled to the exemption from federal income tax provided by § 501 (c)(6) of the Internal Revenue Code of 1954, 26 U. S. C. § 501 (c)(6).[1]

## I

In 1971, during a contest for control of Midas, Midas muffler franchisees organized the Association under the New York Not-for-Profit Corporation Law. The Association's purpose was to establish a group to negotiate unitedly with Midas management. Its principal activity has been to serve as a bargaining agent for its members in dealing with Midas. It has enrolled most Midas franchisees as members.[2] The Association was successful in negotiating a new form of franchise agreement which prevents termination during its 20-year life except for cause. It also persuaded Midas to eliminate its requirement that a customer pay a service charge when a guaranteed Midas muffler is replaced. And the Association

---

[1] The statute exempts:

"Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players) not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

[2] The trial court, in focusing on the Association's fiscal years ended November 30 in 1971, 1972, and 1973, found that 290 franchised Midas dealers were members of the Association. App. 18a. This was about 50% of the dealers. By the time of the trial in 1975, the Association included almost 80% of all Midas dealers. Id., at 49a.

sponsors group insurance programs, holds an annual convention, and publishes a newsletter for members.

The Association sought the exemption from federal income tax which § 501 (c)(6) provides for a "business league." Treasury Regulation § 1.501 (c)(6)–1, 26 CFR § 1.501 (c)(6)–1 (1978), states that the activities of a tax exempt business league "should be directed to the improvement of business conditions of one or more lines of business." [3] In view of that requirement, the Internal Revenue Service initially rejected the Association's exemption application, stating that § 501 (c)(6) "would not apply to an organization that is not industry wide." [4]

The Association then (in October 1972) amended its bylaws and eliminated the requirement that its members be Midas franchisees. Despite that amendment, and despite the Association's announced purpose to promote the interests of individuals "engaged in business as muffler dealers," [5] it neither recruited nor acquired a member who was not a Midas franchisee.[6]

---

[3] The regulation reads:

"A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. . . . A stock or commodity exchange is not a business league, a chamber of commerce, or a board of trade within the meaning of section 501 (c)(6) and is not exempt from tax. . . ."

[4] Letter dated March 28, 1972, from District Director (New York), Internal Revenue Service, to the Association. Complaint Exhibit C, Record Document No. 1.

[5] Certificate of Incorporation of National Muffler Dealers Association, Inc., ¶ 3. App. 41a.

[6] According to an Association survey, Midas has 21% of the replacement muffler business in 18 major metropolitan markets. See 565 F. 2d 845,

In 1974, after the Internal Revenue Service had issued a final rejection of the Association's exemption application, the Association filed income tax returns for its fiscal years 1971, 1972, and 1973, and, thereafter, claims for refund of the taxes paid with those returns. The 1972 claim was formally denied. Subsequent to that denial, and after more than six months had passed since the filing of the 1971 and 1973 claims, see § 6532 (a)(1) of the 1954 Code, 26 U. S. C. § 6532 (a)(1), the Association brought this suit in the United States District Court for the Southern District of New York asserting its entitlement to a refund for the income taxes paid for the three fiscal years. The District Court found: "There is no evidence that [the Association] confers a benefit on the muffler industry as a whole or upon muffler franchisees as a group." App. to Pet. for Cert. 11a. It then concluded that "Midas Muffler franchisees do not constitute a 'line of business,'" and held that the Association was not a "business league" within the meaning of § 501 (c)(6), and thus was not entitled to the claimed refund. App. to Pet. for Cert. 13a–14a.

The United States Court of Appeals for the Second Circuit affirmed. 565 F. 2d 845 (1977). It confronted what it called the "lexicographer's task of deciding what is meant by a 'business league.'" *Id.*, at 846. Finding no direct guidance in the statute, the court applied the maxim *noscitur a sociis* ("[i]t is known from its associates," Black's Law Dictionary 1209 (Rev. 4th ed. 1968)), and looked "at the general characteristics of the organizations" with which business leagues were grouped in the statute, that is, chambers of commerce and boards of trade. The court agreed with the Service's deter-

847 n. 2 (CA2 1977). A letter dated November 27, 1975, sent out by the Association's president and seeking new members, contained the greeting, "Dear Fellow Midas Dealer." In that letter, the Association's president announced a joint endeavor with Midas "to improve the Midas program," and stated, "I have been as loyal to the Midas business as I have to our country." App. 49a.

mination, in § 1.501 (c)(6)–1 of the regulations, that a business league is an "organization of the same general class as a chamber of commerce or board of trade." Reasoning that it was the "manifest intention" of Congress by the statute "to provide an exemption for organizations which promote some aspect of the general economic welfare rather than support particular private interests," the court concluded that the "line of business" requirement set forth in the regulations is "well suited to assuring that an organization's efforts do indeed benefit a sufficiently broad segment of the business community." 565 F. 2d, at 846–847. The court noted that any success the Association might have in improving business conditions for Midas franchisees, and any advantage it might gain through tax exemption, would come at the expense of the rest of the muffler industry, and concluded that the Association's purpose was too narrow to satisfy the line-of-business test.

The court, *id.*, at 847 n. 1, explicitly refused to follow the decision in *Pepsi-Cola Bottlers' Assn.* v. *United States,* 369 F. 2d 250 (CA7 1966). There, the Seventh Circuit, by a divided vote, had upheld the exempt status of an association composed solely of bottlers of a single brand of soft drink. It did so on the ground that the line-of-business requirement unreasonably narrowed the statute.

We granted certiorari to resolve this conflict. 436 U. S. 903 (1978).

## II

The statute's term "business league" has no well-defined meaning or common usage outside the perimeters of § 501 (c)(6). It is a term "so general . . . as to render an interpretive regulation appropriate." *Helvering* v. *Reynolds Co.,* 306 U. S. 110, 114 (1939). In such a situation, this Court customarily defers to the regulation, which, "if found to 'implement the congressional mandate in some reasonable manner,' must be upheld." *United States* v. *Cartwright,* 411 U. S.

546, 550 (1973), quoting *United States* v. *Correll,* 389 U. S. 299, 307 (1967).

We do this because "Congress has delegated to the [Secretary of the Treasury and his delegate, the] Commissioner [of Internal Revenue], not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U. S. C. § 7805 (a)." *United States* v. *Correll,* 389 U. S., at 307. That delegation helps ensure that in "this area of limitless factual variations," *ibid.,* like cases will be treated alike. It also helps guarantee that the rules will be written by "masters of the subject," *United States* v. *Moore,* 95 U. S. 760, 763 (1878), who will be responsible for putting the rules into effect.

In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. A regulation may have particular force if it is a substantially contemporaneous construction of the statute by those presumed to have been aware of congressional intent. If the regulation dates from a later period, the manner in which it evolved merits inquiry. Other relevant considerations are the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute. See *Commissioner* v. *South Texas Lumber Co.,* 333 U. S. 496, 501 (1948); *Helvering* v. *Winmill,* 305 U. S. 79, 83 (1938).

### III

#### A

The history of Treas. Reg. § 1.501 (c)(6)-1 and its "line of business" requirement provides much that supports the Government's view that the Association, which is not tied to a particular community and is not industrywide, should not be exempt. The exemption for "business leagues" from federal

income tax had its genesis at the inception of the modern income tax system with the enactment of the Tariff Act of October 3, 1913, 38 Stat. 114, 172. In response to a House bill which would have exempted, among others, "labor, agricultural, or horticultural organizations," the Senate Finance Committee was urged to add an exemption that would cover nonprofit business groups. Both the Chamber of Commerce of the United States and the American Warehousemen's Association, a trade association for warehouse operators,[7] submitted statements to the Committee. The Chamber's spokesman said:

> "The commercial organization of the present day is not organized for selfish purposes, and performs broad patriotic and civic functions. Indeed, it is one of the most potent forces in each community for the improvement of physical and social conditions. While its original reason for being is commercial advancement, it is *not in the narrow sense of advantage to the individual, but in the broad sense of building up the trade and commerce of the community as a whole . . . ."* (Emphasis added.) Briefs and Statements on H. R. 3321 filed with the Senate Committee on Finance, 63d Cong., 1st Sess., 2002 (1913) (hereinafter Briefs and Statements).

The Chamber's written submission added:

> "These organizations receive their income from dues . . . which business men pay that they *may receive in common with all other members of their communities or of their industries* the benefits of cooperative study of local development, of civic affairs, of industrial resources, and of local, national, and international trade." (Emphasis added.) *Id.,* at 2003.[8]

---

[7] See Proceedings of the Twenty-Third Annual Meeting of the American Warehousemen's Association (1913).

[8] The Chamber's statement and submission, and those of the American Warehousemen's Association, Briefs and Statements 2040, assume an

The Committee was receptive to the idea, but rejected the Chamber's proposed broad language which would have exempted all "commercial organizations not organized for profit." Instead, the Committee, and ultimately the Congress, provided that the tax would not apply to

"business leagues, nor to chambers of commerce or boards of trade, not organized for profit or no part of the net income of which inures to the benefit of the private stockholder or individual." Tariff Act of Oct. 3, 1913, § IIG (a), 38 Stat. 172.

Congress has preserved this language, with few modifications, in each succeeding Revenue Act.[9]

The Commissioner of Internal Revenue had little difficulty determining which organizations were "chambers of commerce" or "boards of trade" within the meaning of the statute. Those terms had commonly understood meanings before the

---

importance here beyond that usually afforded such documents in the interpretation of statutes. They do so for two reasons. First, the submissions are the only available evidence of the amendment's purpose. The amendment was not discussed on the floor of either the House or the Senate, see J. Seidman, Legislative History of Federal Income Tax Laws 1002, 1003 (1938). and the Committee Reports do no more than state its text, see S. Rep. No. 80, 63d Cong., 1st Sess., 25–26 (1913); H. R. Conf. Rep. No. 86, 63d Cong., 1st Sess., 26 (1913). Second, the subsequent administrative interpretation of the statute directly parallels the language of the private submissions.

[9] Revenue Act of 1916, § 11 (a), Seventh, 39 Stat. 766 (punctuation added); Revenue Act of 1918, § 231 (7), 40 Stat. 1076; Revenue Act of 1921, § 231 (7), 42 Stat. 253; Revenue Act of 1924, § 231 (7), 43 Stat. 282; Revenue Act of 1926, § 231 (7), 44 Stat. 40; Revenue Act of 1928, § 103 (7), 45 Stat. 813 (real estate boards added); Revenue Act of 1932, § 103 (7), 47 Stat. 193; Revenue Act of 1934, § 101 (7), 48 Stat. 700; Revenue Act of 1936, § 101 (7), 49 Stat. 1674; Revenue Act of 1938, § 101 (7), 52 Stat. 481; Internal Revenue Code of 1939, § 101 (7), 53 Stat. 33; Internal Revenue Code of 1954, § 501 (c) (6), 68A Stat. 164. See also Act of Nov. 8, 1966, Pub. L. No. 89–800, § 6 (a), 80 Stat. 1515 (reference to professional football leagues added).

statute was enacted.[10] "Business league," however, had no common usage, and in 1919 the Commissioner undertook to define its meaning by regulation. The initial definition was the following:

"A business league is an association of persons having some common business interest, which limits its activities to work for such common interest and does not engage in a regular business of a kind ordinarily carried on for profit. Its work need not be similar to that of a chamber of commerce or board of trade." Treas. Regs. 45, Art. 518 (1919).

This language, however, proved too expansive to identify with precision the class of organizations Congress intended to ex-

---

[10] Webster's New International Dictionary 245, 366 (1913), defined the terms as follows:

board of trade: "In the United States, a body of men appointed for the advancement and protection of business interests. Cf. chamber of commerce."

chamber of commerce: "[A] board or association to protect the interests of commerce, chosen from among the merchants and traders of a city. The term *chamber of commerce* is by some distinctively used of the bodies that are intrusted with the protection of general commercial interests, esp. in connection with foreign trade and *board of trade* for those dealing primarily with local commerce."

In *Retailers Credit Assn.* v. *Commissioner*, 90 F. 2d 47, 51 (CA9 1937), an additional explanation of the difference between the two terms was offered:

"Although the terms 'chamber of commerce' and 'board of trade' are nearly synonymous, there is a slight distinction between their meanings. The former relates to all businesses in a particular geographic location, while the latter may relate to only one or more lines of business in a particular geographic location, but need not relate to all."

In L. O. 1121, III–1 Cum. Bull. 275, 280 (1924), the Solicitor of Internal Revenue rejected an approach to the term "board of trade" that would have encompassed "organizations which provide conveniences or facilities to certain persons in connection with buying, selling, and exchanging goods."

empt. The Service began to cut back on the last sentence of the material just quoted when, in 1924, the Solicitor of Internal Revenue invoked *noscitur a sociis* to deny an exemption requested by a stock exchange. He reasoned that, while a stock exchange conceivably could come within the definitions of a "business league" or "board of trade," it lacked the characteristics that a "business league," "chamber of commerce," and "board of trade" share in common and that form the basis for the exemption. Congress must have used those terms, he said, "to indicate organizations of the same general class, having for their primary purpose the promotion of business welfare." The primary purpose of the stock exchange, by contrast, was "to afford facilities to a limited class of people for the transaction of their private business." L. O. 1121, III–1 Cum. Bull. 275, 280–281 (1924). The regulation was then amended so as specifically to exclude stock exchanges. T. D. 3746, IV–2 Cum. Bull. 77 (1925).[11]

In 1927, the Board of Tax Appeals, in a reviewed decision with some dissents, applied the principle of *noscitur a sociis* and denied a claimed "business league" exemption to a corporation organized by associations of insurance companies to provide printing services for member companies. *Uniform Printing & Supply Co.* v. *Commissioner,* 9 B. T. A. 251, aff'd, 33 F. 2d 445 (CA7), cert. denied, 280 U. S. 591 (1929). In 1928, Congress revised the statute so as specifically to exempt real estate boards that local revenue agents had tried to

---

[11] See Treas. Regs. 69, Art. 518 (1926). Because the regulation now incorporates the denial of exempt status to stock exchanges, L. O. 1121 eventually was declared obsolete. Rev. Rul. 68–207, 1968–1 Cum. Bull. 577, 578.

In *United States* v. *Leslie Salt Co.,* 350 U. S. 383, 393–394, and n. 12 (1956), the Court approved a similar use of *noscitur a sociis* by the Solicitor in defining the term "certificate of indebtedness." See L. O. 909, Sales Tax Rulings, No. 85 (1920).

tax.[12]  The exclusion of stock exchanges, however, was allowed to remain.

In 1929, the Commissioner incorporated the principle of *noscitur a sociis* into the regulation itself.  The sentence, "Its work need not be similar to that of a chamber of commerce or board of trade," was dropped and was replaced with the following qualification:

> "It is an organization of the same general class as a chamber of commerce or board of trade.  Thus, its activities should be directed to the improvement of business conditions or to the promotion of the general objects of one or more lines of business as distinguished from the performance of particular services for individual persons."
> Treas. Regs. 74, Art. 528 (1929).

This language has stood almost without change for half a century [13] through several re-enactments and one amendment of the statute.

During that period, the Commissioner and the courts have been called upon to define "line of business" as that phrase is employed in the regulation.  True to the representation made by the Chamber of Commerce, in its statement to the Senate in 1913, that benefits would be received "in common with all other members of their communities or of their industries," *supra*, at 478, the term "line of business" has been interpreted

---

[12] Revenue Act of 1928, § 103 (7), 45 Stat. 813.  See Hearings on Revenue Revision 1927–1928, before the House Committee on Ways and Means, Interim 69th–70th Cong. 235–239, 268 (1927); H. R. Rep. No. 2, 70th Cong., 1st Sess., 17 (1927).

[13] See Treas. Regs. 77, Art. 528 (under 1932 Act); Treas. Regs. 86, Art. 101 (7)–1 (under 1934 Act) ("or to the promotion of the general objects" dropped); Treas. Regs. 94, Art. 101 (7)–1 (under 1936 Act); Treas. Regs. 101, Art. 101 (7)–1 (under 1938 Act); Treas. Regs. 103, § 19.101 (7)–1 (under 1939 Code); Treas. Regs. 111, § 29.101 (7)–1 (same); Treas. Regs. 118, § 39.101 (7)–1 (same); T. D. 6301, 1958–2 Cum. Bull. 197, 203–204, and Treas. Reg. § 1.501 (c) (6)–1 (under 1954 Code).

to mean either an entire industry, see, *e. g., American Plywood Assn.* v. *United States,* 267 F. Supp. 830 (WD Wash. 1967); *National Leather & Shoe Finders Assn.* v. *Commissioner,* 9 T. C. 121 (1947), or all components of an industry within a geographic area, see, *e. g., Commissioner* v. *Chicago Graphic Arts Federation, Inc.,* 128 F. 2d 424 (CA7 1942); *Crooks* v. *Kansas City Hay Dealers' Assn.,* 37 F. 2d 83 (CA8 1929); *Washington State Apples, Inc.* v. *Commissioner,* 46 B. T. A. 64 (1942).[14]

Most trade associations fall within one of these two categories.[15] The Commissioner consistently has denied exemption to business groups whose membership and purposes are narrower. Those who have failed to meet the "line of business" test, in the view of the Commissioner, include groups composed of businesses that market a single brand of automobile,[16] or have licenses to a single patented product,[17] or bottle one type of soft drink.[18] The Commissioner has reasoned that these groups are not designed to better conditions in an entire industrial "line," but, instead, are devoted to the promotion

---

[14] Cf. *Produce Exchange Stock Clearing Assn.* v. *Helvering,* 71 F. 2d 142, 144 (CA2 1934) (organization not entitled to exemption because "[n]othing is done to advance the interests of the community or to improve the standards or conditions of a particular trade, as in the case of chambers of commerce, real estate boards, and boards of trade"); Note, 35 Ford. L. Rev. 738, 741 (1967).

[15] The Department of Commerce has defined a trade association as "a nonprofit, cooperative, voluntarily-joined, organization of business competitors designed to assist its members *and its industry* in dealing with mutual business problems." J. Judkins, National Associations of the United States viii (1949) (emphasis added).

[16] Rev. Rul. 67–77, 1967–1 Cum. Bull. 138, superseding I. T. 4053, 1951–2 Cum. Bull. 53 (to the same effect under prior law). Cf. Rev. Rul. 55–444, 1955–2 Cum. Bull. 258 (industrywide advertising program exempt).

[17] Rev. Rul. 58–294, 1958–1 Cum. Bull. 244.

[18] Rev. Rul. 68–182, 1968–1 Cum. Bull. 263 (announcing nonacquiescence in *Pepsi-Cola Bottlers' Assn.* v. *United States,* 369 F. 2d 250 (CA7 1966)).

of a particular product at the expense of others in the industry.[19]

In short, while the Commissioner's reading of § 501 (c)(6) perhaps is not the only possible one, it does bear a fair relationship to the language of the statute, it reflects the views of those who sought its enactment, and it matches the purpose they articulated. It evolved as the Commissioner administered the statute and attempted to give to a new phrase a content that would reflect congressional design. The regulation has stood for 50 years, and the Commissioner infrequently but consistently has interpreted it to exclude an organization like the Association that is not industrywide. The Commissioner's view therefore merits serious deference.

## B

The Association contends, however, that the regulation is unreasonable because it unduly narrows the statute. This argument has three aspects: First, the Association argues that this Court need not defer to the regulation because, instead of being a contemporaneous construction of the statute, it is actually contrary to the regulation first in force from 1919 to 1929. Second, it argues that the addition in 1966 of pro-

---

[19] See Rev. Rul. 76-400, 1976-2 Cum. Bull. 153, 154. Cf. Rev. Rul. 61-177, 1961-2 Cum. Bull. 117 (organization to improve members' competitive standing in various lines of business through lobbying exempt).

The Association contends that the "line of business" language in the regulation does not represent a separate requirement for exemption but, instead, is merely illustrative of the type of organization normally granted an exemption. Both the Commissioner and the courts, however, have repeatedly characterized the line-of-business test as one that must be met before a business-league exemption will be allowed. See Rev. Rul. 67-77, 1967-1 Cum. Bull. 138; *United States* v. *Oklahoma City Retailers Assn.*, 331 F. 2d 328, 331 (CA10 1964); *Associated Industries of Cleveland* v. *Commissioner*, 7 T. C. 1449, 1466 (1946). While the plausibility and consistency of the Commissioner's interpretation are relevant to the reasonableness of the regulation as applied here, the Commissioner is otherwise free to determine how the regulation he has written should be construed.

fessional football leagues to the statutory list of exempt organizations makes a new view of *noscitur a sociis* appropriate. Third, it contends that, if the maxim applies here, the Court should reach out beyond § 501 (c)(6) and take into account the fact that the Association's bargaining function is much like that of a labor organization which would be exempt under § 501 (c)(5). We consider these arguments in turn.

1. As noted above, the Commissioner's first definition of "business league" provided that its work *"need not* be similar to that of a chamber of commerce or board of trade." Treas. Regs. 45, Art. 518 (1919) (emphasis added). The Association contends that, because this language differs from the language that replaced it in 1929, the latter is not a "contemporaneous construction" to which this Court should defer, *Bingler* v. *Johnson,* 394 U. S. 741, 749–750 (1969), but is instead an arbitrary narrowing of the statute. It is said that the earlier language rejects the rule of *noscitur a sociis,* and that it is the earlier language that should be treated by the Court as truly authoritative.

Contemporaneity, however, is only one of many considerations that counsel courts to defer to the administrative interpretation of a statute. It need not control here. Nothing in the regulations or case law, see *Produce Exchange Stock Clearing Assn.* v. *Helvering,* 71 F. 2d 142 (CA2 1934), directly explains the regulatory shift. We do know, however, that the change in 1929 incorporated an interpretation thought necessary to match the statute's construction to the original congressional intent.[20] We would be reluctant to adopt the rigid view that an agency may not alter its interpretation in light of administrative experience. In *Helvering* v. *Wilshire Oil*

---

[20] The Court has said: "The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki* v. *G. D. Searle & Co.,* 367 U. S. 303, 307 (1961).

*Co.,* 308 U. S. 90, 101 (1939), the Court acknowledged the need for flexibility and applied a 1929 regulation to a taxpayer even though the taxpayer had acted in reliance on an opposite interpretation incorporated in an earlier regulation. Here, where there is no claim that the Association ever relied on the Commissioner's prior view, the case for accepting the later regulation as authoritative is even stronger.

2. In 1966, Congress amended § 501 (c)(6) by adding to the list of exempt organizations "professional football leagues (whether or not administering a pension fund for football players)." Act of Nov. 8, 1966, Pub. L. 89–800, § 6 (a), 80 Stat. 1515. The Association contends that a professional football league is not of the same general character as a chamber of commerce or board of trade, and that a new view of *noscitur a sociis* is appropriate, one that would include the Association within the exemption. This, of course, is the complement to the first argument.

Nothing in the legislative history of the amendment, however, indicates that Congress objected to or endeavored to change the Commissioner's position as to the class of organizations included in § 501 (c)(6).[21] The purpose of the amendment was to forestall any claim that a football league's pension plan would be considered inurement of benefits to a private individual. Congressman Mills stated flatly that "no inference is intended by this change as to the application of section 501 (c)(6) to other types of organizations." 112 Cong. Rec. 28228 (1966).

Nor does the Association share characteristics in common with a professional football league that would necessarily

[21] See H. R. Conf. Rep. No. 2308, 89th Cong., 2nd Sess., 9–10 (1966); Summary of the Act Temporarily Suspending the Investment Credit and Limiting the Use of Accelerated Depreciation, Joint Committee on Internal Revenue Taxation, 22 (1966); 112 Cong. Rec. 26882–26887, 28226, 28228 (1966).

entitle it to exemption even if a new view of *noscitur a sociis* were applied. The teams in a football league depend on mutual cooperation to promote a common business purpose. They need a league to provide uniform rules of play. A franchisee, however, does not need another franchisee in order to bargain with its franchisor, even though joint bargaining may make them more powerful. Also, it is not without significance that the 1966 amendment was part of a large statutory package which paved the way for a merger which created an "industrywide" professional football league. It can hardly be read to evince a congressional intent that other associations that are not industrywide should be afforded tax-exempt status.

3. The Association says that, if *noscitur a sociis* is to apply, then sound policy considerations support the reasonableness of searching for *socii* beyond the confines of § 501 (c)(6). The Association draws a comparison to other exempt organizations, particularly labor unions that are exempt under § 501 (c)(5). The Association says that, like a labor union, it exists to redress unequal bargaining power in the marketplace. Some States have special legislation protecting franchisee associations.[22] Employer bargaining associations that deal with unions in a particular industry are exempt "business leagues." Rev. Rul. 65–14, 1965–1 Cum. Bull. 236, 238. It is argued that the Association meets all the regulation's requirements except the line-of-business test.[23] Applying the

---

[22] See, *e. g.*, Franchise Practices Act, N. J. Stat. Ann. § 56:10–7 (West Supp. 1978–1979); Franchise Investment Protection Act, Wash. Rev. Code § 19.100.180 (1976).

[23] The Association is nonprofit, and the Government does not contend here that it engages in a regular business of a kind ordinarily carried on for profit, or that its income inures to individual members, or that it performs particular services for individual members in the fee-for-service sense. It does, however, provide services that benefit Midas franchisees exclusively.

thin logic of that requirement to tax a nonprofit organization like the Association, it is said, unreasonably will discourage joint action to improve shared business conditions and will yield only scant revenue to the Treasury. The Association concludes that it would be appropriate now to expand the "business league" exemption to embrace the modern phenomenon of franchisee associations that was unknown in 1913.

These arguments are not unlike those that persuaded the Senate to add the business-league exemption to the 1913 bill. See Briefs and Statements 2002–2003. Perhaps Congress would find them forceful today. The Association, however, needs more than a plausible policy argument to prevail here. Just last Term, in *Fulman* v. *United States,* 434 U. S. 528, 536 (1978), the Court upheld a regulation which had a "reasonable basis" in the statutory history, even though the taxpayer's challenge to its policy had "logical force." *Id.,* at 534, 536, and 540 (dissenting opinion). The choice among reasonable interpretations is for the Commissioner, not the courts. Certainly, *noscitur a sociis* does not compel the Commissioner to draw comparisons that go beyond the text of the Senate's amendment to the 1913 bill, particularly when the Senate Finance Committee, in drafting the amendment, rejected a broad proposal modeled on the same labor exemption the Association now wishes to incorporate.

In sum, the "line of business" limitation is well grounded in the origin of § 501 (c) (6) and in its enforcement over a long period of time. The distinction drawn here, that a tax exemption is not available to aid one group in competition with another within an industry, is but a particular manifestation of an established principle of tax administration. Because the Association has not shown that either the regulation or the Commissioner's interpretation of it fails to "implement the congressional mandate in some reasonable manner,"

*United States* v. *Correll,* 389 U. S., at 307, the Association's claim for a § 501 (c)(6) exemption must be denied.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST and MR. JUSTICE STEVENS join, dissenting.

I would reverse the judgment for substantially the reasons expressed by the Court of Appeals for the Seventh Circuit in *Pepsi-Cola Bottlers' Assn.* v. *United States,* 369 F. 2d 250 (1966). Additionally, I note that the initial administrative interpretation of the statute in the Treasury Regulations was exactly the opposite of the one now urged. *Ante,* at 480. That is strong evidence of the understanding of the meaning of the law at the time it was enacted.