WARNER W. HODGDON AND SHARON D. HODGDON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21563-88.          Filed April 8, 1992.

*Bruce I. Hochman, Dennis L. Perez, Steven R. Toscher,* and *Sanford Holo,* for petitioners.
*Sherri Spradley,* for respondent.

## OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioners' income taxes as follows:

| TYE | Deficiency |
|---|---|
| Dec. 31, 1980 | $222,493 |
| Dec. 31, 1981 | 248,928 |
| Dec. 31, 1982 | 183,465 |
| Dec. 31, 1983 | 59,768 |

Petitioners resided in San Bernardino, California, at the time they filed the petition in this case. The case was submitted on the basis of a stipulation of facts and exhibits. The parties have settled all but one of the matters in dispute. The remaining issue is whether the "bargain sale" rule contained in section 1011(b)[1] required petitioners to recognize gain on the contribution of real property to a charity in 1980. Prior to 1978, petitioners purchased land at 2700 Little Mountain Drive in San Bernardino, California. During 1978 and 1979, they caused seven one-story office buildings to be constructed

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

on this property. Petitioners obtained a construction loan in the amount of $2,200,000 from Wells Fargo Bank (Wells Fargo), and also incurred liability in an undisclosed original amount to J.D. Diffenbaugh, Inc. (Diffenbaugh) in connection with the construction of the buildings.

On December 22, 1980, petitioners contributed the property at 2700 Little Mountain Drive to Campus Crusade for Christ (Campus Crusade), which at all relevant times has been a qualified charitable organization described in section 501(c)(3) and section 170(b)(1)(A). The Commissioner and petitioners have stipulated that the property had a fair market value of $3,932,360 on the date it was contributed to Campus Crusade. Campus Crusade took the property subject to the then outstanding liabilities to Wells Fargo and Diffenbaugh. Those liabilities totaled $2,624,103 at the time the property was conveyed to Campus Crusade. There is no dispute that Campus Crusade's acceptance of the property subject to those liabilities constituted a sale and that the amount realized was $2,624,103.[2]

Previously, on May 7, 1980, petitioners had donated a different parcel of land to the City of San Bernardino, California. The deductible value of that land for purposes of the charitable deduction was $800,000, prior to the application of the percentage limitations on such deductions. There is no dispute that both of the properties contributed to Campus Crusade and San Bernardino were "capital gain" properties within the meaning of section 170(b)(1)(C)(iv). Although petitioners made other charitable contributions in 1980, the Campus Crusade and San Bernardino contributions were the only ones consisting of capital gain properties.

The Commissioner determined that petitioners' contribution of the encumbered Campus Crusade property to Campus Crusade constituted a "bargain sale". As explained below, a disposition of property to which the "bargain sale" rule applies is treated as a sale of part of the property and a charitable

---

[2]The Campus Crusade property was also subject to a liability for the payment of real estate taxes of $25,071. Although petitioners took this amount into account on their return in computing the amount of the contribution, the stipulation of the parties does not treat it as an "amount realized" for purposes of determining the gain (assuming sec. 1011(b) does apply) or for determining how much charitable deduction is allowable.

contribution of the remaining part. Sec. 1011(b). We agree with the Commissioner that the bargain sale rule contained in section 1011(b) applied to petitioners' disposition of the Campus Crusade property, and that petitioners must therefore recognize gain on the disposition of the sale portion in accordance with the provisions of section 1011(b).

Congress enacted section 1011(b) as part of a larger package of reforms designed to curb abuses of the charitable deduction. See H. Rept. 91-413 (Part 1), at 54 (1969), 1969-3 C.B. 234-235. One such abuse involved the sale of appreciated property to a charity at a price which was less than the fair market price and which typically equaled the basis of the property. Prior to the enactment of section 1011(b), a taxpayer was permitted to use the entire basis of the property to offset the amount realized on the sale, and would thus realize no gain where the price equaled the basis of the property. See secs. 1001, 1011(a). In addition, the taxpayer received a charitable deduction equal to the appreciation inherent in the property, which had not previously been taxed. Thus, a taxpayer could recover his basis in the property free of tax while receiving a charitable deduction for the untaxed appreciation. See H. Rept. 91-413, *supra*, 1969-3 C.B. at 235.

Congress considered this combination of tax benefits "unwarranted" and enacted section 1011(b) to eliminate one element of the excessive benefit.[3] Section 1011(b) provides:

SEC. 1011(b). BARGAIN SALE TO A CHARITABLE ORGANIZATION.—If a deduction is *allowable* under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property. [Emphasis added.]

Thus, if a charitable deduction is allowable by reason of a sale, only a portion of the adjusted basis of the contributed property may be used to offset the amount realized on such sale. And section 1011(b) provides in substance that the portion of the basis that may be so used is determined by multiplying the adjusted basis by a fraction, the numerator of which is the amount realized on the sale, and the denominator of which is

---

[3] Sec. 1011(b) entered the Internal Revenue Code through the Tax Reform Act of 1969, Pub. L. 91-172, sec. 201(f), 83 Stat. 564.

the fair market value of the contributed property. See also sec. 1.1011-2(b), Income Tax Regs.

The parties agree that a sale occurred when Campus Crusade accepted the contributed property subject to indebtedness of $2,624,103, and that this indebtedness was the amount realized on such sale. See sec. 1.1011-2(a)(3), Income Tax Regs. However, petitioners contend that such sale did not result in an "allowable" charitable deduction within the meaning of section 1011(b) so as to bring that section into play. We must decide whether the bargain sale of the Campus Crusade contribution resulted in an "allowable" deduction within the meaning of section 1011(b).

Section 1.1011-2(a)(2), Income Tax Regs., is directly on point. That provision states that—

If in the taxable year there is a sale or exchange of property which gives rise to a charitable contribution which is carried over under section 170(b)(1)(D)(ii)[4] or section 170(d) to a subsequent taxable year * * * , section 1011(b) * * * must be applied for purposes of apportioning the adjusted basis of the property for the year of the sale or exchange, *whether or not such contribution is allowable as a deduction under section 170 in such subsequent year.* [Emphasis added.]

Under this regulation, then, a charitable contribution resulting from a bargain sale of property is an "allowable" deduction within the meaning of section 1011(b) if part or all of the contribution may be carried over as a deduction to a subsequent taxable year, regardless of whether or not the portion carried over is ever used as a deduction.

In their opening brief, petitioners "frankly admit [that] the Regulation supports" the application of the bargain sale rule to their Campus Crusade contribution. However, petitioners contend that "the language of the Regulation is 'at war' with the language of the Code." They reason in effect that (1) because no part of the Campus Crusade contribution was ever used as a deduction, no deduction was "allowable" as a result of a sale within the meaning of section 1011(b), and (2) because section 1.1011-2(a)(2), Income Tax Regs., would

---

[4]As indicated in the quoted portion of the regulation, the carryover for excess contributions of capital gain property was originally provided in sec. 170(b)(1)(D)(ii). See Tax Reform Act of 1969, Pub. L. 91-172, sec. 201(a)(1)(B), 83 Stat. 551. However, that provision was redesignated sec. 170(b)(1)(C)(ii) for taxable years beginning after Dec. 31, 1976. Tax Reform Act of 1976, Pub. L. 94-455, secs. 1901(a)(28)(A)(ii) and 1901(d), 90 Stat. 1768, 1803.

require the recognition of gain despite the fact that no deduction ever actually became available, the cited regulation is invalid. We reject both of these contentions, the first because it is based on the faulty major premise that no part of the Campus Crusade contribution was ever used as a deduction, and the second because section 1.1011-2(a)(2), Income Tax Regs., is not in any event invalid.[5]

In considering petitioners' contentions in detail, it is first necessary to examine the portions of section 170 that limited the amount of charitable deduction to which petitioners were entitled.[6] Although the total deductible value of the contribu-

---

[5]We note in passing that a portion of sec. 1.1011-2(a)(1), Income Tax Regs., was invalidated by our opinion in *Estate of Bullard v. Commissioner,* 87 T.C. 261 (1986) (Court reviewed). However, the invalidated portion involved the relationship between sec. 170(e) and sec. 1011(b). Neither sec. 170(e) nor the portion of sec. 1.1011-2(a)(1), Income Tax Regs., invalidated by *Bullard* is involved herein.

[6]SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year. * * *

(b) PERCENTAGE LIMITATIONS.—

(1) INDIVIDUALS.—In the case of an individual, the deduction provided in subsection (a) shall be limited as provided in the succeeding subparagraphs.

(A) GENERAL RULE.—Any charitable contribution to—

\*     \*     \*     \*     \*     \*     \*

[description of various charitable organizations]

\*     \*     \*     \*     \*     \*     \*

shall be allowed to the extent that the aggregate of such contributions does not exceed 50 percent of the taxpayer's contribution base for the taxable year.

(C)` SPECIAL LIMITATION WITH RESPECT TO CONTRIBUTIONS OF CERTAIN CAPITAL GAIN PROPERTY.—

(i) In the case of charitable contributions of capital gain property to which subsection (e)(1)(B) does not apply, the total amount of contributions of such property which may be taken into account under subsection (a) for any taxable year shall not exceed 30 percent of the taxpayer's contribution base for such year. For purposes of this subsection, contributions of capital gain property to which this paragraph applies shall be taken into account after all other charitable contributions.

(ii) If charitable contributions described in subparagraph (A) of capital gain property to which clause (i) applies exceeds 30 percent of the taxpayer's contribution base for any taxable year, such excess shall be treated, in a manner consistent with the rules of subsection (d)(1), as a charitable contribution of capital gain property to which clause (i) applies in each of the 5 succeeding taxable years in order of time.

\*     \*     \*     \*     \*     \*     \*

(iv) For purposes of this subparagraph, the term "capital gain property" means, with respect to any contribution, any capital asset the sale of which at its fair market value at the time of the contribution would have resulted in gain which would have been long-term capital gain. * * *

\*     \*     \*     \*     \*     \*     \*

tions of the San Bernardino and Campus Crusade properties was stipulated in effect to be $2,107,537,[7] both of these contributions were subject to the 30-percent limitation of section 170(b)(1)(C)(i) in respect of the deduction for the year in which the contributions were made (1980). Amounts in excess of these limitations could be carried forward to the 5 taxable years following the contribution year, but their use during those years was subject to the 50-percent limitation of section 170(d)(1). The various percentage limitations are applied to the taxpayer's "contribution base" for a given taxable year. The term "contribution base" is defined in section 170(b)(1)(E) (later redesignated as section 170(b)(1)(F)) to mean adjusted gross income computed without regard to net operating loss carrybacks. Thus, the amount of adjusted gross income in each of the 5 carryover years could be a factor in determining the amount or even the availability of a deduction in each such subsequent year.

---

(E) CONTRIBUTION BASE DEFINED.—For purposes of this section, the term "contribution base" means adjusted gross income (computed without regard to any net operating loss carryback to the taxable year under section 172).

\*       \*       \*       \*       \*       \*       \*

(d) CARRYOVERS OF EXCESS CONTRIBUTIONS.—

(1) INDIVIDUALS.—

(A) IN GENERAL.—In the case of an individual, if the amount of charitable contributions described in subsection (b)(1)(A) payment of which is made within a taxable year (hereinafter in this paragraph referred to as the "contribution year") exceeds 50 percent of the taxpayer's contribution base for such year, such excess shall be treated as a charitable contribution described in subsection (b)(1)(A) paid in each of the 5 succeeding taxable years in order of time, but, with respect to any such succeeding taxable year, only to the extent of the lesser of the two following amounts:

(i) The amount by which 50 percent of the taxpayer's contribution base for such succeeding taxable year exceeds the sum of the charitable contributions described in subsection (b)(1)(A) payment of which is made by the taxpayer within such succeeding taxable year (determined without regard to this subparagraph) and the charitable contributions described in subsection (b)(1)(A) payment of which was made in taxable years before the contribution year which are treated under this subparagraph as having been paid in such succeeding taxable year; or

(ii) in the case of the first succeeding taxable year, the amount of such excess, and in the case of the second, third, fourth, or fifth succeeding taxable year, the portion of such excess not treated under this subparagraph as a charitable contribution described in subsection (b)(1)(A) paid in any taxable year intervening between the contribution year and such succeeding taxable year.

[7]The stipulation of the parties is framed in terms of "Total contributions subject to the 30% limitation", a reference obviously to sec. 170(b)(1)(C) relating to contributions of "capital gain property". But since the Campus Crusade and San Bernardino contributions were the only capital gain property contributions made in 1980, the stipulation of the parties must of necessity refer to those two contributions.

There is no dispute that the amounts available to petitioner for deduction in respect of capital gain property were $447,443 for 1980, $20,963 for 1981, and nothing thereafter. Accordingly, the total amount of capital gain property that petitioners were entitled to deduct was $468,406—an amount that is less than the $800,000 deductible value of the San Bernardino property. Petitioners take the position that since the San Bernardino property was contributed earlier in 1980 than the Campus Crusade property, the $800,000 San Bernardino contribution must be deducted in its entirety before any part of the Campus Crusade contribution is deducted. If that were the case, the entire allowable deductions relating to capital gain property in 1980 and 1981 ($447,443 and $20,963, respectively) would be charged against the $800,000 San Bernardino contribution, leaving nothing to be deducted attributable to the Campus Crusade contribution. We reject petitioners' contention. There is no basis for holding that the San Bernardino contribution must be deducted before the Campus Crusade contribution merely because the San Bernardino contribution was made earlier in petitioners' 1980 taxable year.

There is nothing in section 170 even to suggest that any such "first-in, first-out" rule applies to the contributions of the San Bernardino and Campus Crusade properties. In setting forth the relevant limitation on the amount of charitable contributions that can be deducted in a taxable year, section 170(b)(1)(C)(i) simply states that "the total amount of contributions" may not exceed the prescribed limit. Similarly, section 170(b)(1)(C)(ii) uses the term "such excess" to describe the contributions that exceed the statutory limit and may therefore be carried forward in a manner consistent with the rules of section 170(d)(1). Moreover, the second sentence in section 170(b)(1)(C)(i) makes clear that Congress was aware of problems relating to the order in which contributions might be taken into account. Congress there set forth a sequential application of the statute as it applied to capital gain property by providing that contributions of such property were to be taken into account only after all other charitable contributions. But Congress did not provide any "first-in, first-out" rule or any other rule under which one contribution of capital gain property could be considered made before another contribution

of the same type of property made in the same taxable year. In our judgment, Congress did not intend section 170 to impose such a rule. Nor does section 1011(b) itself imply that a distinction is to be made among charitable contributions based on the order within which the contributions were made during a single taxable year.

Petitioners have not cited any statutory provisions, regulations, cases, or other authority in support of their position. We cannot reasonably infer the existence of an ordering rule such as that proposed by petitioners, and absent such a rule, we conclude that the $468,406 that petitioners were allowed to deduct had its source in the homogenous pool that had been created by the San Bernardino and Campus Crusade contributions. We therefore cannot hold that the contribution of the Campus Crusade property did not result in an allowable charitable deduction. For this reason alone, petitioners' attack on section 1.1011-2(a)(2), Income Tax Regs., must fail.

Section 1.1011-2(a)(2), Income Tax Regs., it may be remembered, provides in effect that even if a bargain sale of property resulted in a charitable contribution carryover that was never used, the taxpayer may nevertheless be required to recognize gain as a result of that bargain sale. Petitioners contend that this regulation ignores the statutory requirement of an "allowable" deduction since it would require them to recognize gain on the bargain sale despite the fact that they ultimately did not gain any benefit of a deduction. We have already rejected petitioners' contention that the contribution of the Campus Crusade property did not in fact result in an allowable deduction, and we must therefore also reject petitioners' conclusion that the regulation ignores the statutory requirement of an "allowable" deduction. Even if it is assumed that a "first-in, first-out" rule exists, so that petitioners never received the benefit of any deduction in 1980 with respect to the Campus Crusade contribution or realized any benefit in any carryover year from the potential for deduction, section 1.1011-2(a)(2), Income Tax Regs., is nevertheless valid.

Treasury regulations are entitled to a high degree of deference from the courts. Specifically, a Treasury regulation must be upheld if it "implement[s] the congressional mandate in some reasonable manner". *National Muffler Dealers Association v. United States,* 440 U.S. 472, 476-477 (1979)

(quoting *United States v. Correll,* 389 U.S. 299, 307 (1967)). That is, Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes". *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948). For reasons stated hereinafter, we are convinced that section 1.1011-2(a)(2), Income Tax Regs., is neither unreasonable nor inconsistent with section 1011(b).

The reasonableness of the regulation becomes clear when one considers that the word "allowable" should be read, not in isolation, but in the context of provisions for a 5-year carry-over. Thus, if a taxpayer may not get the full benefit of a deduction in the year of the contribution, section 170(d)(1) and 170(b)(1)(C)(ii) establish the potential for a deduction in one or more of the 5 succeeding years. And in this context the effect of the relevant statutes of limitation on the rights of the taxpayers and the Government may play a crucial role in the interpretation of the word "allowable", the meaning of which might otherwise appear to be clear if the word is read literally.

Assuming that a taxpayer files a return on or before the date on which it is due, and that the return does not report any gain as a result of the bargain sale, the Commissioner may assess a deficiency relating to such gain within 3 years of the due date of the return. See sec. 6501(a) and (b)(1). Thus, if the taxpayer has not had the benefit of a deduction in the year of the contribution or in either of the 2 succeeding years, the Commissioner could not know even at the end of the third carryover year without having audited the return for that third year whether the taxpayer would have been entitled to a deduction for that third year. After such audit, the statute of limitations would then have foreclosed the Commissioner from assessing a deficiency for the year of contribution.

Moreover, the situation after the fourth and fifth carryover years would have even more strikingly deprived the Commissioner of her right to assess a deficiency in respect of the year of contribution. Assuming that no deductions had been available for the year of contribution and the 4 succeeding years, it would still be uncertain whether a deduction would be available for the fifth year until the conduct of an audit of the fifth year return. Such an audit could realistically take place no sooner than within the sixth year after the filing of the return for the year of contribution—long after the expiration

of the period of limitations for assessment of a deficiency in respect of the year of contribution. On the other hand, if the taxpayer initially reported and paid tax on the gain on the sale, and the carryover subsequently expired unused at the end of the 5-year carryover period, the 3-year period of limitations for filing a claim for refund (section 6511) would have expired by the time it was determined that he in fact did not have the benefit of any deduction. See sec. 6511.

We think it unlikely that Congress intended the substantive rights of taxpayers and the Government to be imperiled by a rule providing that no deduction was "allowable" for purposes of section 1011(b) unless it eventually turned out, long after the taxable year, that the contribution actually reduced the taxpayer's taxable income in any of the 5 succeeding taxable years. At most, the matter of legislative intent in the use of the word "allowable", which involves a potential for allowance for a 5-year carryover period, is open to conjecture—precisely the kind of situation that may appropriately be dealt with by regulation. We think that if the statute is read in the context of all relevant provisions, the word "allowable" must be interpreted as referring to a contribution available for deduction even though the contribution does not ultimately result in a deduction by reason of future events entirely unrelated to the nature of the charitable contribution. This interpretation of the statute strongly supports section 1.1011-2(a)(2), Income Tax Regs., which is not in any real sense "at war" with the statute.

"Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." *United States v. Correll, supra* at 305-306. But cf. *Helvering v. Wilshire Oil Co.,* 308 U.S. 90 (1939). Section 1011(b) survives unchanged since its enactment in 1969. And section 1.1011-2(a)(2), Income Tax Regs., has likewise remained unaltered since it was first promulgated in 1972. Such continuity, although not necessarily conclusive, nevertheless supports our conclusion that the regulation is not unreasonable or inconsistent with the statute.

We have considered various other contentions made by petitioners, but have concluded that they do not merit discus-

sion. We have found that petitioners' bargain sale of the Campus Crusade property resulted in an "allowable" charitable contribution deduction pursuant to section 1011(b). Petitioners' adjusted basis for the purpose of recognizing gain on the disposition of the property must therefore be computed in accordance with that section.

*Decision will be entered under Rule 155.*