In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-2332

ABA RETIREMENT FUNDS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 6993 — **John J. Tharp, Jr.**, *Judge.*

ARGUED JUNE 5, 2014 — DECIDED JULY 21, 2014

Before WOOD, *Chief Judge*, and EASTERBROOK and KANNE,
*Circuit Judges*.

WOOD, *Chief Judge*. ABA Retirement Funds, to which we
refer simply as ABA Retirement, appeals the district court's
denial of its request for tax-exempt status for the years 2000
through 2002. Agreeing with the Internal Revenue Service,
the district court found that ABA Retirement was not a tax-
exempt "business league" under 26 U.S.C. § 501(c)(6) during

the relevant period. We agree with that assessment and af-
firm.

**I**

Because the district court granted summary judgment for
the United States, the account that follows represents the
undisputed facts along with all reasonable inferences that
favor ABA Retirement. See FED. R. CIV. P. 56(c). ABA Retire-
ment is an Illinois not-for-profit corporation whose prede-
cessor, American Bar Retirement Association, was incorpo-
rated in 1963 at the direction of the American Bar Associa-
tion as a non-profit corporation. The entity's name later
changed to ABA Retirement Funds, but the change has no
effect on the issues before us, and so we use only the current
name. The prospectus for the new entity stated that it was
organized "for the sole purpose of providing members of the
[ABA] and their employees with a retirement plan designed
to take advantage of the income tax benefits which apply to
a qualified retirement plan." To that end, the prospectus con-
tinued, ABA Retirement was charged with "promoting and
facilitating the operation of [tax-qualified retirement plans],
and this is the only activity" in which ABA Retirement was
expected to engage.

While ABA Retirement's stated purpose was to provide
members of the ABA (and later organizations with at least
one ABA-member participant) with retirement plans, ABA
Retirement *itself* did not have members in the traditional
sense. Its day-to-day operations were run by John Puetz and
a staff of three; its only "members" were the people who
made up the ABA's Board of Governors. These "members,"
of whom there were about 38 from 2000 to 2002, appointed
the officers of ABA Retirement and the trustee of its retire-

ment plans. In time, ABA Retirement created several master retirement plans for adoption by lawyers and law firms. We will refer to these plans in the aggregate as "the Plan" and the Plan in combination with ABA Retirement and its vendors' activities done in connection with it as "the Program."

Until 1992, the Program was offered pursuant to a group annuity contract issued by Equitable Life Insurance Company of America (Equitable). At that time, members of the ABA Retirement's Board of Directors were the trustees of the master trusts. They had direct responsibility for the selection, retention, and termination of the managers of the investment options offered by the Program. That changed in 1999 when ABA Retirement hired State Street Bank and Trust to replace Equitable and perform additional duties as sole Plan trustee, at which point the ABA Retirement directors ceased to be trustees in order to comply with federal securities law. Under the new arrangement, while ABA Retirement was no longer a trustee, it created and maintained the IRS-approved master tax-qualified retirement plans and took on the role of Plan fiduciary. Had ABA Retirement not undertaken the fiduciary role, the federal Employee Retirement Income Security Act (ERISA) would have required an employer who adopted the retirement plans for its employees either to assume the duties or hire a third party to do so. The Program as a whole competed with other retirement plans in the market.

ABA Retirement, as Plan fiduciary, had the authority to engage, monitor, and fire its trustee, State Street. It was responsible for the design and maintenance of Plan documents (including making sure that they were tax-qualified), oversight of vendors, contract negotiations, and the review and

approval of State Street's annual marketing plan. The latter task included making recommendations to State Street about targets for growth of participants and assets. ABA Retirement also made the plans available to the public without charge from 2000 to 2002. The free documents, however, did not come with an adoption agreement, even though they were tailored to ABA Retirement's trust. State Street was responsible for marketing generally, but ABA Retirement promoted the Plan through mail solicitations to attorneys, Sections of the ABA, and other bar groups. It did not limit itself to advertising the plans; it actively worked both to publicize them and to see that they were sold. State Street handled record keeping, a variety of administrative services, and the direct marketing of the Plan to the legal profession (though ABA Retirement reviewed and approved the annual marketing plan). State Street had the authority to engage and fire investment advisors, but it was required to consult with ABA Retirement and give full consideration to ABA Retirement's recommendations. As noted, ABA Retirement had the power to fire State Street.

ABA Retirement had a financial incentive to increase plan assets, since the Plan paid ABA Retirement a program expense fee for its services in connection with the Program based on a percentage of the total invested assets, excluding assets invested in self-directed brokerage accounts. Those who wished to pursue the self-directed route were required to invest a minimum of 5% of their total investment in accounts that would be subject to the program expense fee. ABA Retirement received the interest on the funds. The amount in the funds was not trivial; on its tax returns for 2000, 2001, and 2002, ABA Retirement reported a gross income of $1,861,258, $1,667,862, and $1,601,217, respectively.

Its taxable income for those years was $672,098, $384,972, and $411,874; it held assets worth approximately $3.5 million. The tax returns show that ABA Retirement described itself as an employee benefit fund, and its product was retirement plans.

For a long time, it appears that ABA Retirement's revenues were not large enough to raise tax concerns among its managers. It treated itself as a taxable entity until 2004, when it sought tax-exempt status at the time it filed its Form 1024. In August 2005, the IRS notified ABA Retirement that ABA Retirement did not qualify for the exemption from federal income tax under section 501(c)(6) of the Code. ABA Retirement then filed administrative claims for refunds on the taxes it paid from 2000 through 2002 and, again, those were denied. ABA Retirement responded with this suit, arguing that it was a tax-exempt "business league" under I.R.C. § 501(c)(6), 26 U.S.C. § 501(c)(6), during the period from 2000 to 2002, and thus was entitled to a refund for federal income taxes paid. The government contended that ABA Retirement was not a "business league" and thus it owed the taxes. The district court agreed with the government and granted summary judgment in its favor. ABA Retirement appeals.

**II**

The question whether an association is a business league for purposes of 26 U.S.C. § 501(c)(6) is a mixed question of law and fact, but on summary judgment we must accept the facts in the light most favorable to the nonmoving party and ask whether the law nonetheless requires judgment for the movant. See *Guide Int'l Corp. v. United States*, 948 F.2d 360, 361 (7th Cir. 1991). Our review is *de novo*. See *Hakim v. Accenture U.S. Pension Plan*, 718 F.3d 675, 681 (7th Cir. 2013).

We begin with the language of the key statute, 26 U.S.C. § 501(c)(6), which grants a tax exemption to:

> Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

The statute does not define "business league," and the term "has no well-defined meaning or common usage outside the perimeters of § 501(c)(6)." *Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 476 (1979). In fact, the Court noted that the precise term "business league" is one "so general … as to render an interpretive regulation appropriate." *Id.* (citing *Helvering v. Reynolds Co.*, 306 U.S. 110, 114 (1939)).

The Treasury Department furnished just what the Court called for. See Treas. Reg. § 1.501(c)(6)-1 (1978), 26 C.F.R. § 1.501(c)(6)–1; see also *Nat'l Muffler,* 440 U.S. at 484 (Treasury regulation "merits serious deference"). Paraphrased, the regulation provides that an organization qualifies as a business league if and only if it is an association (1) "of persons having some common business interest;" (2) "the purpose of which is to promote such common interest;" (3) that is not organized for profit; (4) that does not "engage in a regular business of a kind ordinarily carried on for profit;" (5) whose activities are "directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons," and; (6) that is "of the same general class as a chamber of commerce or board of trade." See Treas. Reg. § 1.501(c)(6)-1, 26 C.F.R. § 1.501(c)(6)–1.

This is not a close case; save for the fact that it is a non-profit corporation, ABA Retirement fails every necessary condition for business league status. Because the district court's opinion is thorough, here we focus on just two of the reasons why ABA Retirement is not a business league: (1) its activities are not directed to the improvement of business conditions for the legal field generally; and (2) it engages in a business ordinarily conducted for profit.

### 1. *Improving business conditions of the legal profession*

One of the prerequisites to business-league status is that the entity's activities must be "directed to the improvement of business conditions of one or more lines of business *as distinguished from* the performance of particular services for individual persons." Treas. Reg. 1.501(c)(6)-1 (emphasis added). ABA Retirement fails to satisfy this requirement for at least two reasons: first, it characterized its business as the provision of individual benefits; and second, it has not shown anything that could reasonably be called improvement of business conditions for the legal profession generally.

On the tax returns it filed for the relevant years ABA Retirement stated that its business was the operation of an employee benefit fund and its product was retirement plans. This is a perfectly good business, but it is one that provides benefits to individual persons, not to an entire field of commerce. We have no doubt that, as § 1.501(c)(6)-1 recognizes, some organizations may improve business conditions in a line of business by performing services that benefit individual industry participants. Although state-created and thus not quite on point here, the Washington State Apple Advertising Commission illustrates the general idea. See *Hunt v.*

*Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977). Another example might be the Owner-Operator Independent Drivers Association. See *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580 (7th Cir. 2011). But those individual benefits must be incidental to the industry-wide benefits. The regulation requires improvement of business conditions "as distinguished from" the performance of particular services. That requires line-drawing. Organizations that provide benefits to an industry only by benefitting specific individuals within that industry fall on the other side of the "business league" line. ABA Retirement counters that lawyers secure in their retirement are happy, confident lawyers, and this is reflected in the general satisfaction quotient for the profession as a whole. That may be true: we do not doubt that retirement planning is good for the legal profession generally (as it is for everyone else), but ABA Retirement furnished that benefit almost exclusively by providing a particular service to particular persons, namely, retirement plans for those who signed up for its Program. The fact that it also distributed some materials without charge does not change the nature of the enterprise.

*Assoc. Master Barbers & Beauticians of Am., Inc. v. Comm'r of Internal Revenue*, 69 T.C. 53 (1977), is instructive. It stands for the proposition that regardless of whether an organization's activities further an exempt purpose, if those actions do not use non-exempt means, they will not receive tax-exempt status. The association in question was a non-profit entity that had been organized to unify master barbers. *Id.* at 55. The court did not question that the described goal would improve the conditions of the master barber industry. In trying to achieve this goal, the association provided its mem-

bers with (among other things) various types of insurance, from which it received commissions. *Id.* at 59.

The tax court recognized that an organization "whose principal purpose and activity is such as to qualify for 'business league' exemption does not lose its exempt status by engaging in incidental activities which standing alone would be subject to taxation." It therefore proceeded to "examine the extent of petitioner's insurance activities to see if they constitute[d] only incidental, as opposed to substantial, activities." *Id.* at 67. It found that the association's insurance activities were directed towards providing benefits to individuals within the industry and those activities were substantial. This was enough, it held, to require a finding that the association did not qualify for business league status. Here, we know that ABA Retirement's involvement with the Program was in no way "incidental"—it was the fiduciary, and its own prospectus states that it was incorporated "for the purpose of promoting and facilitating the operation of the Plan and this is the only activity in which it is expected that ABA Retirement will engage." ABA Retirement's day-to-day goal was to promote its own plan first and general retirement savings in the legal profession second; it therefore cannot receive tax-exempt status under § 501(c)(6).

   2.  *Business ordinarily conducted for profit*

Related to the finding that ABA Retirement's activities were aimed primarily at the provision of services to individual persons was the fact that it engaged in the business of providing retirement plans, a business ordinarily conducted for profit. ABA Retirement argues that the district court reached this conclusion by "conflating" ABA Retirement with the Program. It explains that while the Program *itself*

may have been a business ordinarily conducted for profit, the Program was administered by State Street and ABA Retirement simply sponsored the Program as part of its mission to improve the condition of the legal industry.

ABA Retirement focuses on the "sponsoring" language because, pursuant to IRS regulations, a trade organization "having characteristics similar to those described in section 1.501(c)(6)-1 of the regulations" (*i.e.* characteristics similar to a business league) is permitted to sponsor retirement plans without losing its tax-exempt status. Rev. Proc. 89-9, 1989-1 C.B. 780, *superseded by* Rev. Proc. 2000-20, 2000-1 C.B. 553. Because the IRS approved ABA Retirement's retirement plans, and a condition of that approval that the organization have characteristics "similar to" a business league, ABA Retirement argues it *is* therefore a business league entitled to the exemption. Unfortunately, this is a bridge too far.

As a matter of logic, simply because $x$ has "characteristics similar to" $y$ does not necessarily make $x$ a $y$. A cucumber has characteristics similar to a zucchini but it is not, in fact, a zucchini. And, while having characteristics similar to a zucchini may be enough for some purposes (for instance, to stand in as a zucchini in an impressionist still life), it will not be enough when an object possessing *all* the characteristics of a zucchini—in other words, a zucchini itself—is required (say, when making zucchini bread). In order to be a business league for purposes of 26 U.S.C. § 501(c)(6), ABA Retirement must satisfy every condition laid out in § 1.501(c)(6)-1; for purposes of Rev. Proc. 89-9 it needed only to have characteristics "similar to" those in the regulation.

Returning to the question at hand—whether ABA Retirement was engaged in business ordinarily done for profit

during the relevant period—the answer is an unequivocal yes. ABA Retirement did not just sponsor the Program; it was the Program fiduciary. Assuming fiduciary duties on behalf of law firms that sign up for the Program is itself an act ordinarily done for profit. ABA Retirement has cited no case, nor can we find one, in which an entity was a plan fiduciary under ERISA and yet qualified as an exempt business league.

ABA Retirement finally relies on *Am. Acad. of Family Physicians v. United States*, 91 F.3d 1155 (8th Cir. 1996), where the Eighth Circuit found that the Academy's sponsorship of a group insurance program did not translate into taxable business activity by the Academy. See *id.* at 1159. Again, however, we see important differences between that case and ours. First, the question was not whether the Academy was a business league but instead whether the payments it received through its sponsorship of the insurance plans were taxable under 26 U.S.C. § 511 as "unrelated business taxable income." Our case involves the antecedent question whether ABA Retirement is a business league. As we explained above, ABA Retirement's activities were not primarily directed toward the improvement of the legal profession *as distinguished* from the performance of particular services for individual persons. Second, even if we put that aside, there are other crucial differences between ABA Retirement and the Academy. In *Family Physicians*, the insurance program was administered "in its entirety by an unrelated, non-exempt corporation" over which the Academy "had no administrative or underwriting responsibilities" for the policies. 91 F.3d at 1159. The amounts paid to the Academy in relation to the insurance program "were neither brokerage fees nor other compensation for commercial services, but were the way the

parties decided to acknowledge the Academy's eventual claim to the excess reserves while [the policy administrator] was still holding and using the reserves." *Id.* In contrast, nearly all of ABA Retirement's income came from a program expense fee State Street paid it for services in connection with the Program. The fee was also based on a percentage of the total invested assets. Unlike the Academy, ABA Retirement was the Plan fiduciary. *Family Physicians* does not compel a different result.

*********************

We conclude that ABA Retirement is not a business league under 26 U.S.C. § 501(c)(6). We therefore AFFIRM the judgment of the district court.